# Lewis v. Geisinger Medical Center

*Robert E. Bull, Sidney Z. Levy,* of *Levy, Mattes, Preate & McNulty,* for plaintiffs.

*F. Porter Wagner, H. Alvan Baird, E. Robert Marks* and *Laurence H. Eldredge,* for defendants.

KREISHER, P. J., August 8, 1967.—On April 19, 1962, a summons in trespass was issued in the above-captioned case, and on November 5, 1962, the complaint was filed. On November 14th, defendants filed preliminary objections to the complaint, and on November 27th, plaintiffs filed an amended complaint.

On December 31st, defendants filed interrogatories and on January 10, 1963, plaintiffs filed objections to some of said interrogatories. On January 19th, an-

swers to said interrogatories not objected to were filed.

On February 13th, counsel for defendant hospital filed a motion to dismiss, alleging the "charitable immunity" doctrine.

On February 16th, plaintiff filed interrogatories addressed to defendant drug company, and on March 21st, answers thereto were filed.

On March 22nd, plaintiffs filed a motion to strike the said motion filed on behalf of said hospital. The court issued a rule, making the same returnable to April 18th, to show cause why the motion should not be granted.

On March 28th, the court filed an opinion and order of court disposing of plaintiffs' objections to said interrogatories.

On April 10th, plaintiffs filed interrogatories addressed to defendant doctors, and on April 15th, counsel for defendant hospital filed an answer to plaintiffs' motion to strike defendants' motion to dismiss.

On April 23rd, defendant doctors filed their answers to said interrogatories, and on July 23, 1963, lengthy depositions of defendant doctors were taken and later transcribed.

On May 19, 1964, lengthy depositions of plaintiff wife were taken, and on June 8th and June 11th, the deposition of Dr. E. P. Swartz and Dr. S. E. Rynes were taken on behalf of defendants.

On August 27, 1965, the court filed an opinion and order dismissing the motion filed on behalf of defendant hospital to dismiss.

On September 15th, defendant doctors and defendant hospital filed an answer to the amended complaint, and defendant hospital, under the heading "New Matter", pleaded the defense of charitable immunity.

On September 24th, counsel for plaintiffs filed an

answer to the said new matter denying application of said doctrine in this case.

On October 13, 1966, counsel for defendant drug company filed a motion for summary judgment, and on October 15th, plaintiffs filed requests for admissions under Pennsylvania Rule of Civil Procedure 4014, as amended.

On October 24th, counsel for defendant drug company filed requests for admissions under said rule, and an answer to plaintiffs' requests for admissions.

On October 25th, plaintiffs' counsel filed an answer to said drug company's motion for summary judgment. Said matter was ruled for argument, and is now before the court for disposition.

The amended complaint alleges that the wife plaintiff was admitted to defendant hospital on February 11, 1960, as a paying patient, for the purpose of being treated primarily for bronchial asthma.

She remained there as an in-patient under the care of Dr. Raymond J. Wiss until February 29th, when she was placed on a regime of drugs and diet and placed on an out-patient status. On a return visit during the latter part of April, following an interview with F. W. Davison, M. D., of the hospital staff, she was given a renewable prescription and directions for the use of the drug Chloromycetin, manufactured and marketed by defendant drug company.

Sometime during the month of May 1960, and continuing thereafter, she suffered "rashes, purpura, easy bruising of the skin and petechiae over her lower extremities and other symptoms related to a grievous blood disorder including pancytopenia, thrombocytopenia and aplastic anemia".

Paragraph Eight alleges the proximate cause of the said blood disorder to be the negligent prescription and administration of the drug by the doctors and their principal, the hospital.

Paragraph Nine alleges the proximate cause of said condition to be a breach by the drug company of the express or implied warranties that the said drug was fit for human consumption.

Paragraph Ten alleges that the proximate cause of said condition is the failure of the said drug company adequately to inform the medical profession, institutions and pharmacies of the dangers involved in the use of said drug.

The said requests for admissions under Pa. R. C. P. 4014, as amended, on behalf of plaintiffs and defendant drug company relate exclusively to plaintiff's physical condition both before and after the alleged cause of action arose; therefore, said requested admissions are not relevant to the question of law now before the court for summary judgment, as authorized under Pa. R. C. P. 1035, which provides, inter alia, as follows:

"(A) After the pleadings are closed, but within such time as not to delay trial, any party may move for summary judgment on the pleadings, depositions, answers to interrogatories, admissions on file and supporting affidavits, if any.

"(B) The adverse party, prior to the day of hearing, may serve opposing affidavits. The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file; together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issues of liability alone although there is a genuine issue as to the amount of damages".

Said motion for summary judgment reads as follows:

"Pursuant to Pa. R. C. P. 1035, the defendant, Parke, Davis & Company, by its attorneys, E. Robert Marks and Laurence H. Eldredge, moves for summary judgment in favor of said defendant.

"The following reasons are assigned in support of this motion:

"1. The thrust of the plaintiffs' claim against Parke, Davis & Company is set forth in Paragraph Ten of the Amended Complaint and complains of said defendant's failure to give adequate warning of the possible side effects in using chloromycetin and of the precautions to be taken in its use.

"2. The following facts are contained in the Answers of Parke, Davis & Company to plaintiffs' interrogatories: 'Chloromycetin was made generally available for use by or upon the prescription of members of the medical profession, including those affiliated with hospitals or clinics on or about March 25, 1949. It has never been made available for use by the general public' (No. 5). The chemical name for chloromycetin is chloramphenicol (No. 1). 'The Food and Drug Administration of the Federal Security Agency conducted a survey in 1952 (of chloramphenicol) and the data collected were referred to the National Research Council' (12a). 'Letters were sent to physicians on July 7, 1952, and August 12, 1952, alerting them to the reported association between the use of chloramphenicol and the occurrence of blood dyscrasias. A copy of the August 12 letter was also sent to pharmacists. Additionally, information with respect to the 1952 Food and Drug Administration survey and the review by the National Research Council Committee were published in pronouncements caused to be placed in the Journals of the American Medical Association for July 12, July 26 and August 23, 1952' (No. 15). 'Also, commencing about September 6, 1952, and continuously thereafter the label on all packages of chlo-

romycetin distributed for systemic use contained the following: "Warning—Blood dyscrasias may be associated with intermittent or prolonged use. It is essential that adequate blood studies be made" '.

"Additionally, on all promotional pieces mailed and distributed to physicians, and advertisements which mentioned indications for use and dosages, the following or substantially the following language appeared: 'Chloromycetin is a potent therapeutic agent and because certain blood dyscrasias have been associated with its administration, it should not be used indiscriminately or for minor infections. Furthermore, as with certain other drugs, adequate blood studies should be made when the patient requires prolonged or intermittent therapy' (No. 22). 'The advertisements referred to in the answer to interrogatory No. 22 were published from time to time in various medical journals throughout the country having national, state or local distribution aggregating approximately 150 different medical journals' (No. 23). 'Prior to about May of 1954 advertisements appeared from time to time in approximately 30 different drug or pharmaceutical journals' (No. 28-B).

"As stated in response to interrogatary No. 15, a copy of its August 12, 1952 letter to physicians was sent to pharmacists. Additionally, commencing with its original marketing and continuously thereafter, the label of all Chloromycetin products has contained one of the following: 'Caution: To be dispensed only by or on the prescription of a physician.' (No. 32). 'Chloromycetin has never been made available to the general public' (No. 33).

"3. The depositions of Dr. F. W. Davison, taken on July 23, 1963, establishes his complete familiarity with the history and nature of chloromycetin including the investigation of it by the Food and Drug Administration in 1952 and he had read and considered

the literature put out by Parke, Davis & Company concerning it. (Deposition 7-9). Dr. Davison buys the book 'New and Non-Official Drugs' every year and he had with him at the time of the deposition his 1959 edition of it. On page 73 of that edition the reference to chloramphenicol commences and on page 74 Dr. Davison had underlined the statement concerning the possible side effects and the necessity for blood studies for all patients receiving this drug. (Deposition 43-44 and defendant's Exhibit 1 attached thereto.) In continuing to prescribe chloromycetin for Mrs. Lewis, the plaintiff, Dr. Davison exercised an informed medical judgment with full knowledge of the statement in this book: 'Although serious and even fatal blood dyscrasias are known to occur after the administration of chloramphenicol, current data seems to indicate that these reactions are very rare.' (Deposition 33).

"4. Dr. Raymond J. Wiss, who was doing his residency work on Dr. Davison's service, was also thoroughly informed as to the possible rare side effects of chloromycetin when he prescribed it for Mrs. Lewis (Deposition 53-55, 65.).

"5. In view of the fact that Chloromycetin (chloramphenicol) is a valuable drug which can be life saving (Dr. Davison deposition page 33) and in view of the fact that it could only be obtained upon a physician's prescription, Parke, Davis & Company fully discharged its legal duty in warning the medical profession of the rare possible side effects from using the drug, the limitations on prescribing it, and the necessity for blood studies to check up on the effect on the patient.

"6. In view of the fact that Dr. Davison and Dr. Wiss, with complete knowledge of the nature of chloromycetin and its possible rare side effects exercised a considered medical judgment in prescribing chloromy-

cetin for the plaintiff's condition, no conduct of Parke, Davis & Company can be found to be a legal cause of the injuries for which she seeks compensation.

"WHEREFORE, a summary judgment should be entered in favor of defendant, Parke, Davis & Company".

Plaintiffs' answer to said motion admits the allegations of paragraphs 1, 3 and 4, but denies paragraphs 2, 5 and 6 as follows:

"TWO: Denied. Defendant is not entitled to rely upon the self-serving answers to plaintiffs' interrogatories as evidence to support the instant motion. Further, plaintiffs deny that the information so imparted is complete and entirely accurate. On the contrary, plaintiffs aver that the drug, Chloromycetin, has been held out to the public as an effective antibiotic without the concomitant notice of its dangers and the precautions to be exercised in its use. That defendant had notice that the drug is normally and customarily dispensed to the user in containers furnished by pharmacists, carrying no warning regarding the potential harmful effect from its use, or instructions regarding the precautions to be taken for their own protection from such harmful effects.

"THREE: Admitted.

"FOUR: Admitted.

"FIVE: Denied. On the contrary it is alleged that the manufacturer owed a duty to the user of the drug, in view of its past advertisements and representations, to warn the user in the expectable context of the manner of its distribution.

"SIX: Denied. The contributory negligence of the physicians in failing to comply with proper practices in the administration of the drug, whether or not they were adequately warned, does not relieve the movant of liability toward the plaintiffs, in view of its former representations and advertising as to the effectiveness

of its drug without the concomitant warnings of the dangers to be exercised in its use.

"WHEREFORE, plaintiffs oppose the entry of summary judgment until all of the facts are properly and adequately developed".

Our first observation relates to the broad scope of the comparatively recent rule 1035 which became effective May 9, 1966, and was made applicable to all pending actions. This rule follows the broad Federal Rule 56(e), as amended July 1, 1963. The commentary in Goodrich-Amram Civil Practice under said rule states: "New Rule 1035 provides a new remedy". The parties are no longer confined to the pleadings on a motion of this nature, but, in addition thereto, due consideration may be given any depositions, answers to interrogatories, any admissions on file and supporting affidavits, if their competency is affirmatively shown. It therefore follows, if the court concludes from all the matters before it that after trial defendant's point for binding instructions would be affirmed, it would be vain to subject defendant to trial.

Our second observation relates to the failure on the part of plaintiff to allege any defect in the manufacture of the product placed upon the market by defendant drug company. Therefore, we must assume that the product was manufactured reasonably safe without defect and in accordance with the requirements as set forth by the Secretary of Health, Education and Welfare, pursuant to the regulations promulgated by him for the certification of batches of drugs composed wholly, or partly, of chloramphenicol, which drug is marketed under the name of Chloromycetin. The absence of this allegation of defect in the manufacture takes this case out of the operation of the general rule of strict liability for a particular batch or defective manufacture. Likewise, we conclude the alleged breach of the express or implied warranty of fitness

for human consumption in paragraph 9 of the complaint is not applicable in this case as we are not dealing with a food product where the product is placed on the open market for general and indiscriminate consumption. (The peculiar circumstances of this case under the doctrine of "products liability" indicates the issue is narrowed down to the question of reasonable and adequate notice of possible harmful side effects and the periodic blood counts during the protracted use of the product.)

The law on the subject is annotated in 13 ALR 3d 1057, under the heading "Products Liability: Strict Liability in Tort". Under section 6(d) of the Note entitled "Unavoidably Unsafe Products", beginning on page 1081, it is stated:

"It is suggested in Comment k following §402A of the Second Restatement of Torts that there may be certain 'unavoidably unsafe products' for which strict liability in tort should not be imposed.

"According to Comment k: 'There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in par-

ticular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk' ".

We do not deem it necessary in this opinion to quote or cite the cases annotated under this section of the Restatement and set forth at length in exhaustive briefs of counsel for defendant drug company, we do note, however, there are a considerable number of cases approving and applying the logic of Comment k, above quoted, and the test or standard used in all of said cases is the "reasonable man" test.

Applying said test to the admitted conduct of the drug company, we must determine whether or not the facts are so clear that reasonable minds would not differ with our conclusion; otherwise, we cannot rule on the matter as a question of law, but must submit the issue to a jury as a question of fact.

Paragraphs 1, 3 and 4 of the defendant's motion, which are admitted and which are above quoted, show the drug here in question was made available to the medical profession for use by prescription only in March 1949, and that it has never been made available for use by the general public. In June 1952, the Federal Security Agency of the Food and Drug Administration upon report from the National Research

Council notified the medical profession and druggists of the possible association between the continued use of the drug and blood dyscrasias. Following September 1952, the label on all packages contained the following: "Warning—Blood dyscrasias may be associated with intermittent or prolonged use. It is essential that adequate blood studies be made".

The company literature and advertisements always contained a statement substantially as follows: "Chloromycetin is a potent therapeutic agent and because certain blood dyscrasias have been associated with its administration, it should not be used indiscriminately or for minor infections. Furthermore, as with certain other drugs, adequate blood studies should be made when the patient requires prolonged or intermittent use".

The label on all Parke-Davis Chloromycetin contained the following: "Caution: To be dispensed only by or on the prescription of a physician"; or, "Caution: Federal Law prohibits dispensing without prescription".

The 1959 edition of "New and Non-Official Drugs", used by the medical profession generally, and in this case specifically by Dr. Davison, who underlined the warning in his edition, contained, inter alia, the following:

"Although serious and even fatal blood dyscrasias are known to occur after the administration of Chloromycetin, current data seems to indicate that these reactions are very rare . . . Granulocytopenia and fatal cases of aplastic anemia have been observed as toxic reactions in the course of therapy with Chloromycetin. Blood studies should be done frequently for all patients receiving this drug".

Since all of the aforementioned precautions, warnings and notices are admitted and would be admitted on trial, we find it difficult to conclude that defendant

drug company failed to give reasonable and adequate warning of possible harmful side effects from prolonged use of the drug and that frequent blood studies should be made when intermittently used.

Counsel for plaintiffs argues the breach of duty by defendant drug company toward his client rests upon the failure of the company to define specifically the term "frequent" as it relates to the interval of time between the blood studies. He contends the word "frequent" is too indefinite and that the company should have directed a fixed time schedule. It goes without saying such an argument is highly technical and illogical under the circumstances. "Frequent" has a well-known meaning, and the physician prescribing the drug would be in the better position to determine the time element, as it is not difficult to suppose different patients might require different time schedules.

The admitted facts in this case lead to but one conclusion in our opinion as to adequate notice, and that conclusion must be that the conduct of defendant drug company meets overwhelmingly the said "reasonable man" test. Defendant company may be a rich drug company and plaintiff an injured individual but that is no reason to subject that company to trial in the absence of some fault or breach of duty owed to plaintiff. Under the admitted facts, even if the jury, out of sympathy or for some other reason, returned a verdict against defendant company, it is our opinion the court would have to set aside the verdict. By the entry of a summary judgment the number of parties is reduced, the issues are narrowed, confusion in the charge deleted and possible post-trial motions avoided. Therefore, without further comment, we enter the following:

### ORDER OF COURT

And now, August 8, 1967, the motion for summary judgment filed on behalf of defendant Parke, Davis &

Company is granted, and an exception thereto is allowed to all remaining parties on record.