## Leibowitz et ux., Appellants, v. Ortho Pharmaceutical Corp.

*David N. Rosen,* with him *Rosen, Sherwin & Seltzer,* for appellant.

*Edward W. Madeira, Jr.,* with him *Murray S. Levin,* for appellee.

OPINION PER CURIAM, June 14, 1973:

The six judges who heard this appeal being equally divided, the judgment is affirmed.

---

OPINION BY HOFFMAN, J., IN SUPPORT OF AFFIRMANCE:

This appeal involves two lawsuits which were consolidated for trial. One action was in Trespass alleging negligence, the other in Assumpsit alleging breach of express and implied warranties. On September 8, 1970, the late Judge Joseph SLOANE of the Common Pleas Court of Philadelphia, sitting without a jury, found for the defendant. Post trial motions were denied by a court en banc, and this appeal followed.

The original causes of action were instituted by Doris Leibowitz and her husband, the appellants herein, to recover damages for a thrombophlebitic condition that allegedly was suffered as a result of ingestion of "Ortho-Novum", a contraceptive pill developed by Ortho Pharmaceutical Corporation, the appellee.

The experimental life of this product and the medical history of the wife-plaintiff are crucial to this case. Therefore, a full discussion of events which took place before the instant cause of action accrued is necessary.

Doris Leibowitz was born in 1922 and enjoyed good health until 1947. In that year, as a result of an abruption of the placenta, she delivered a still-born child by

Caesarian section. Several days after delivery and while hospitalized, Mrs. Leibowitz developed thrombophlebitis, and was treated with anti-coagulants. After two Caesarian births, it was decided that further pregnancies might be injurious to appellant's health, and a tubal ligation was performed. During convalescence, appellant experienced pain in her hip and lower extremities, which was diagnosed as a mild thrombophlebitis.

During the next several years, various gynecological and systemic difficulties were observed by her physician. During 1962, appellant developed irregular menstrual periods, hemorrhoids, obesity, and periodic swelling of her legs, as well as a musculoskeletal problem evidenced by an antalgic gait favoring the left side. Early in 1963, in an attempt to regulate menses, appellant's gynecologist, Dr. Laurence Lundy, prescribed Enovid, a prescription drug. Because of breakthrough bleeding, Enovid was discontinued. In February of 1964, Dr. Lundy prescribed Ortho-Novum in a further attempt to regulate menses. Use of Ortho-Novum proved successful and no untoward results were experienced until August 27, 1964. While at her employment as a legal secretary, Mrs. Leibowitz suffered what was diagnosed as an acute thrombophlebitis in her left leg. She was treated for several weeks by Dr. Raymond Penneys and Dr. Robert Brooks as an in-patient at the Hospital of the University of Pennsylvania. Following this hospitalization, plaintiffs instituted suit against Ortho Pharmaceutical.

Ortho manufactures pharmaceutical products, including Ortho-Novum. This product is a combination of a progestational compound, norethindrone, and an estrogenic compound, mestranol, which was tested and shown to be effective and reliable for the prevention of conception. In 1960, Ortho prepared and submitted to the Food and Drug Adminisration a New Drug Appli-

cation for Ortho-Novum, which was approved in 1962. The drug was marketed sometime in 1963.[1]

Following FDA approval, a package insert accompanying the drug was supplied to the medical profession for guidance in writing prescriptions. The insert stated that Ortho-Novum was an oral contraceptive agent, and set forth the dosage and form of administration recommended to prevent conception. The insert could not be changed without FDA authorization.

Beginning in 1962, there were some medical discussions as to the possible association between thrombophlebitis and the use of progestin-estrogen combinations, as in Enovid and Ortho-Novum. Some individual case reports appeared as to the development of thrombophlebitis in patients taking Enovid. As a result of this debate, the FDA summoned a special ad hoc committee headed by Dr. Irving Wright to investigate the question of the possible association. The Committee conducted careful and comprehensive studies and concluded: "In summary, on the basis of the available data . . . no significant increase in the risk of thromboembolic death from the use of Enovid in this population group has been demonstrated."

On the basis of the Wright Committee Report, and with the approval of the FDA, Ortho inserted the following, in 1963, in its package insert accompanying its product:

"While this study does not resolve completely the possible relationship between progestational agents and intravascular clotting, it tends to confirm the opinions

---

[1] Earlier, in 1957, another manufacturer, G. D. Searle & Company, had received approval for Enovid, a compound containing progestinestrogen combination, and which, in essence, was quite similar in chemical composition and its intended use to Ortho-Novum. While Enovid was also approved for therapeutic purposes, Ortho-Novum was approved and marketed only as a contraceptive drug.

expressed by the Wright Committee. This Committee appointed by the United States Food and Drug Administration to review this problem published their deliberations in the J.A.M.A. It was their conclusion '. . . on the basis of the available data, there was no significant increase in the risk of thromboembolic death. . . .'

"The relationship of a contraceptive combination of an Estrogen-Progestational agent with thromboembolism and death therefrom, particularly in the older age group, is currently under investigation." Finally, under the heading CONTRAINDICATIONS, the following appeared: "A few cases of thrombophlebitis have been reported on patients taking ORTHO-NOVUM. Although there is no evidence to support a causal relationship between the use of ORTHO-NOVUM and the occurrence of venous thrombosis, a definite recent history of thrombophlebitis and/or pulmonary embolism is considered a contraindication to the use of ORTHO-NOVUM."[2]

An article appearing in the Journal of the American Medical Association (JAMA), on February 22, 1964, reviewed the state of medical knowledge to that date, and reported that ". . . to date, there is no definite evidence etiologically linking intravascular thrombosis or embolism with the use of oral contraceptives."

In 1965, the World Health Organization (WHO) conducted further extensive investigation into the causal relationship between thrombophlebitis and oral contraceptives. Examining worldwide statistics of both users and nonusers of contraceptive drugs, the WHO reported:

---

[2] The 1964 Physicians' Desk Reference (PDR) listed the following precautionary note with regard to the prescription of ORTHO-NOVUM: "Physicians should be alert to the possible occurrence of thrombophlebitis or phlebothrombosis in patients to whom ORTHO-NOVUM is prescribed, even though a causal relationship has not been proved or disproved. This possibility should be given particular attention if ORTHO-NOVUM is considered for administration to patients with thromboembolic disease or a history of thrombophlebitis."

"Thrombo-embolic disease has been encountered among women using oral contraceptives, just as it is among non-users. . . . The incidence of thrombophlebitis in non-pregnant women between the ages of 15 and 45 years is not known with certainty, but the best available estimates suggest that it is between 1 and 3 per thousand women per annum. The incidence in women using oral contraceptives is also uncertain . . . but in no reported series has it exceeded the above range. Further, the vital statistics from the United States of America show that while the age-specific death-rates attributed to this condition have risen during the period from 1950 to 1964 inclusive, a similar rise has occurred in the male. Finally, the trend shows no change during the 1960s, when oral contraceptives came increasingly into use in the USA." The WHO Report published in 1966 concluded:

"8.1 Little is known with certainty about contra-indications to the use of oral contraceptives. It can be stated as a general principle that the prescribing physician should, in each individual case, weigh possible effects of the treatment against the effectiveness, acceptability and safety of available alternative contraceptive methods and against the known hazards of pregnancy. . . .

"8.4 From time to time yet other conditions have been suggested as contraindications to oral contraceptive use in the absence of convincing evidence of a cause-and-effect relationship but without a priori reasons for assuming one. These include thrombo-embolic disease. . . . There appears to be no justification for regarding these several conditions as contra-indications. However, it must be emphasized that, as with any therapeutic agent, the possibility of rare, individual idiosyncrasy cannot be overlooked."

There is little argument that the information contained in the package insert with regard to the possible

association between the product and thrombophlebitis adequately reflected the facts known to Ortho, the medical profession and the research study groups at the time plaintiff sustained her illness on August 27, 1964. What is argued is that such causal connection existed and by reason of later studies indicating same plaintiff established a causative "link" between her condition and the use of Ortho-Novum. Plaintiff relies heavily on a British Report which appeared in April of 1968; that Report estimated a 7 to 10-fold increase in mortality and morbidity due to the embolic diseases in women taking oral contraceptives. As a result of the British study, the FDA caused Ortho to revise its insert to reflect the new findings.

At trial, plaintiffs called two expert witnesses, Dr. Penneys and Dr. Brook, who had seen Mrs. Leibowitz at the Hospital of University of Pennsylvania.

On direct examination, Dr. Penneys testified in the following manner in response to a question by plaintiff's counsel as to the cause of the thrombophlebitis:

"A. I didn't make up my mind any more than I do in any patient with thrombophlebitis. It is a condition which exists if a clot is there. . . . Q. Now, you mentioned that you had encircled Ortho-Novum. A. Yes. Q. Why did you do that? A. I think probably either in her mind or mine, or both, already there was a question as to this thing. . . . But so you encircle something you think might be directly pertinent, and that must have registered with me as something, bang, you have got to keep in your mind as you were going over this. . . . Q. Did you reach a conclusion or opinion as to the relationship? A. Enough, enough to convince myself as a practicing physician . . . to tell her what to do . . . to discontinue taking the pill, the Ortho-Novum." The net effect of this testimony was to create serious doubt if Dr. Penneys' "conclusion" expressed any opinion as to causal connection. As a result of the confusion, the

trial court asked for a direct answer to the following: "Q. Have you reached an opinion as to cause and effect with reasonable medical certainty as to this episode which you began to see on August 27, 1964? A. I could say I have. Q. All right, Doctor, what is that opinion? A. I would say, and I can't give you a one word answer on that, but I could say that cause in all biology is never a pure situation. Q. Of course, with reasonable medical certainty. A. I would have to explain that. . . . A significant factor would have been taking the oral contraceptive. That's all—based on my general impression."

Defense counsel cross-examined Dr. Penneys on this "opinion" to determine the true meaning and effect of it. Dr. Penneys reviewed plaintiff's previous medical history and admitted that she was predisposed (to thrombophlebitis). As such Dr. Penneys finally admitted that while the fact that plaintiff took oral contraceptives was "pertinent", he admitted that the condition suffered by plaintiff could have resulted from "other possible causes". Then, in determining at what point, Dr. Penneys had formed his "opinion" as to association, counsel asked the following: "Q. Doctor, some time after in 1965, I think, your file indicates that Mr. Rosen got in touch with you requesting your opinion on causation. Now, could you refer to your letter of May 8, 1965, and read it, please? A. '. . . In reply to your question concerning my thoughts on the relationship between Ortho-Novum and thrombophlebitis, *I have no set ideas.* . . . I know that there is a debate pro and con as to the relationship between this drug and thrombophlebitis, but it will take much research to establish the relationship. . . . *My own opinion is that I have no strong fixed idea on the relationship between drugs such as Ortho-Novum and thrombophlebitis.'* Q. That was your opinion at that time? A. Yes." Plaintiff's counsel tried to rehabilitate the opinion previously stated

by Dr. Penneys to substantiate the causal connection. Defense counsel, however, established on re-cross that Dr. Penneys was basing his opinion on medical literature and studies that were published subsequent to 1964. Furthermore, counsel cast into serious doubt whether in fact Dr. Penneys had any concrete opinion with regard to causal connection. Counsel directed a question as to whether, despite plaintiff's previous medical history which evidenced a predisposition to a recurrence of thrombophlebitis, Dr. Penneys could conclude that Ortho-Novum was the cause of the 1964 thrombophlebitis. Dr. Penneys responded: "A. Is causally related? I refuse to use the term "cause" in any part of my practice. Q. What do you mean? I am at a loss, Doctor. Do you mean that it is something you want to rule out, that it is a possibility in there? A. . . . There is no one cause known in biological science. There are factors that add up. So, I say causally related which means there may be other things related, too. It doesn't exclude other things adding to the— Q. It doesn't exclude other possibilities? A. That's right."

Plaintiff's counsel also called Dr. Brooks, who unambiguously and directly testified on direct examination: "It was my opinion at that time that there was a direct causal relationship between the Ortho-Novum and the thrombophlebitis." If testimony had concluded there, such an opinion would have had to be considered and given appropriate weight. On cross-examination, Dr. Brooks admitted plaintiff had been predisposed because of her past medical history. When asked, however, what facts he had based his opinion on to conclude that Ortho-Novum had caused the thrombophlebitis, he responded: "A. I had arrived at an opinion after discussing the use of oral contraceptives with some of my colleagues and reading the different pieces that had come out that there *could be a relationship between the*

*two. Since I could find no other reason* at that time it was my opinion that this was the cause of the thrombophlebitis." In pressing the matter further, counsel asked: "Q. So you come really down to the point that if you have a predisposed person who happens to be taking an oral contraceptive and they have an incident of phlebitis you immediately conclude that it was the oral contraceptive? A. I can answer that. *My conclusion is that this is the most likely cause.* That's my answer. I have nothing else to go on. . . . Q. So, what you're saying is, as you reviewed the situation on the night of August 27, 1964 what you were given you considered to be the most likely cause? A. Right. Q. And that's your opinion today? A. That is my opinion today."

Defendant produced two expert witnesses. Dr. Kaighn Smith testified that his opinion of the connection between Ortho-Novum and thrombophlebitis was identical to that of the Wright Committee which concluded [as to Enovid] that "there was no significant increase in the risk of thrombo-embolic death from the use of [Ortho-Novum]." He further opined that the 1963-1964 package insert fairly and adequately presented all "the available information with regard to Ortho-Novum" and included a "fair adequate description of the possible association between Ortho-Novum or similar compounds and the possible association with thrombophlebitis."

Dr. G. Arnold Cronk testified for the defendant, stating that thrombophlebitis "has been recognized to occur idiopatically (of its own spontaneity) in our society including child-bearing age women." He described numerous laboratory experiments with the use of Ortho-Novum and found that "the result of those blood coagulation studies [gave no] evidence that would indicate a causal connection." Dr. Cronk described the procedure

Ortho followed in devising its package insert and related that the insert met with FDA approval. He further opined that after reviewing the medical records of Mrs. Leibowitz that "there was no causal relationship between the taking of Ortho-Novum and the thrombophlebitis which Mrs. Leibowitz suffered."

Both Dr. Smith and Dr. Cronk were unshaken in their medical opinions on cross-examination.

At the conclusion of the trial, Judge SLOANE filed an Adjudication on September 8, 1970. The opinion traced both plaintiff's previous history of vascular disorders, including reported incidence of thrombophlebitis, and the scientific data on the subject. Reviewing the evidence with respect to the association between Ortho-Novum and thrombophlebitis, Judge SLOANE stated: "In making this determination, I rely upon the medical testimony at trial to the effect that thrombophlebitis is an idiopathic condition. . . . The incidence of thrombophlebitis between women who use birth control pills and women who do not, is according to American Medical reports much the same. While there is speculation that a causal connection may exist between the taking of certain birth control pills and the incidence of thrombophlebitis in a specific case, there is as yet no reasonably demonstrated connection."

Finding for the defendant, Judge SLOANE concluded: "Where, as here, plaintiff-wife, predisposed to thrombophlebitis, suffers a second onslaught about five months after taking 'Ortho-Novum', and one of plaintiff's experts offers weakly supported causal evidence, the other, opinion evidence, not meeting the standard of 'reasonable certainty' causal connection between the accident and the disease is not sufficiently established."

After reviewing the entire record in this case, we believe that the trial court committed no reversible error.

CAUSAL CONNECTION BETWEEN "ORTHO-NOVUM" AND THROMBOPHLEBITIS

It is not this Court's function to weigh evidence or pass upon the credibility of witnesses. *Commonwealth ex rel. Brown v. Brown,* 195 Pa. Superior Ct. 324, 171 A. 2d 833 (1961). It is rather fundamental to our law that it is the exclusive province of the fact-finder to determine the question of the credibility of witnesses and the weight to be accorded their testimony. *In re Holtz Will,* 422 Pa. 540, 222 A. 2d 885 (1966); *Cherry v. Wolf,* 205 Pa. Superior Ct. 484, 210 A. 2d 917 (1965). Thus, absent manifest error or a finding that the judgment or decree is arbitrary and capricious, we are bound by the lower court on issues of credibility and weight of the evidence. *Contakos v. Contakos,* 204 Pa. Superior Ct. 445, 205 A. 2d 619 (1964).

We are unable to conclude that the trial court could not find defendant's experts more credible than plaintiff's. Both of defendant's experts were unequivocal and unwavering in their opinions that there was no causal link between thrombophlebitis and the use of Ortho-Novum. On the other hand, not only were plaintiff's experts ambiguous and shaken badly on the cross-examination, but their opinions as to medical causation reflect a lack of certainty.

Dr. Penneys stated that thrombophlebitis is often idiopathic. He admitted that plaintiff was predisposed and therefore more likely to contract the condition. He could only state that the use of the contraceptive pill was a "significant factor" and confessed that the condition could have arisen from "other possible causes". Even the Court by its own questioning could not elicit a more definite statement. Furthermore, cross-examination revealed that Dr. Penneys in 1965, a year after the incident, had written a letter to counsel stating he had "no strong fixed idea" on the relationship between the drug and the condition.

Dr. Brooks, on the other hand, could only conclude, as he could find no other reason for the condition in plaintiff and although he admitted she was predisposed, that the use of Ortho-Novum was "the most likely cause". In *Menarde v. Philadelphia Transportation Co.,* 376 Pa. 497, 103 A. 2d 681 (1954), our Supreme Court held that such an opinion failed to meet the standard of expertness required of a witness. The Court stated at 501: "The expert has to testify, not that the condition of claimant might have, or even probably did, come from the accident but that in his professional opinion the result in question *came* from the cause alleged. A less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence." See also, *Florig v. Sears Roebuck & Co.,* 388 Pa. 419, 428, 130 A. 2d 445 (1957).

In light of the above, we are not prepared to say that the trial judge erred in giving more weight to defendant's experts as to causal connection.

### THE DUTY OF A PRESCRIPTION DRUG—COMPANY— THE PACKAGE INSERT

The gravamen of plaintiff's case was that Ortho's package insert had failed to adequately warn plaintiff of the dangers inherent in the use of its product. Setting aside the question of causation, it must be determined if (1) the wording of the package insert adequately reflected the dangers and risks of the drug; (2) whether Ortho breached any duty of care whatsoever with respect to the plaintiff. What is argued is that the insert did not fairly represent the possible dangers raised by other sources. These comprise a scientific debate of significant proportions. In reviewing the evidence presented at trial and in reading the insert itself and accompanying literature provided by Ortho, we believe that the warnings were adequate.

It must be borne in mind that this was a prescription drug. It could not be obtained by anyone except on a doctor's prescription, presented at a drugstore. As our Supreme Court stated in *Incollingo v. Ewing*, 444 Pa. 263, 288, 282 A. 2d 206 (1971): "Since the drug was available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor." It is for the prescribing physician to use his own independent medical judgment, taking into account the data supplied to him from the drug manufacturer, other medical literature, and any other source available to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug. *Incollingo v. Ewing*, supra; also, *Stottlemire v. Cawood*, 213 F. Supp. 897 (D.C.D.C. 1963); *Lewis v. Geisinger Medical Center*, 43 Pa. D. & C. 2d 105 (1967).

Appellee's insert did state that there were cases of thrombophlebitis reported from the use of Ortho-Novum. It stated that there were studies being conducted into the causal connection but that no evidence had established same. It further warned against the prescription of Ortho-Novum to patients having "recent" cases of thrombophlebitis. Because said insert was directed to the practicing physician, who should have been aware of the literature pro and con, we cannot as a matter of law conclude that the insert was misleading or inadequate.

Furthermore, as the Pennsylvania Supreme Court stated in *Incollingo*, supra at 288-289: "We think that whether or not the warnings on the cartons, labels and literature of Parke, Davis in use in the relevant years were adequate, . . . were questions properly for the jury."

Where there is proper warning, a manufacturer of a prescription drug cannot be held liable either on a

breach of warranty or strict liability in tort theory. As our Supreme Court stated in *Incollingo,* supra at 288: " 'The seller of such products', concludes this comment (Comment k) [of Restatement of Torts, 2d, §402A], 'again with the qualification that they are properly prepared and marketed *and proper warning is given,* where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product attended with a known but apparently reasonable risk.' " See also, *Oppenheimer v. Sterling Drug, Inc.,* 7 Ohio App. 2d 103, 219 N.E. 2d 54 (1964).

In approving a drug for marketing purposes, the F.D.A. is ever mindful of risks inherent in the use of a proposed drug. It also approves same because of the benefit said drug may have for the public as a whole. Every surgical procedure carries certain risks, as do driving an automobile or crossing an intersection. As different standards apply in the case of prescription drugs and over-the-counter drugs (the former requiring that the prescribing physician exercise the final judgment in each case), the risks must be balanced against the utility to the public-at-large. The warnings are directed to the prescribing physician who must make that balancing judgment in light of his personal knowledge of the patient's medical history.[3]

---

[3] It should be emphasized that Dr. Lundy, the physician who prescribed Ortho-Novum, testified that he was aware of other data and did not rely solely on the package insert in prescribing the drug. Even if Ortho had failed to adequately warn of dangers, said reason is not actionable in the case of a prescription drug, where the prescribing physician did not rely on the package insert, has full information from other sources, and made his own independent medical judgment to prescribe it. See, *Stottlemire v. Cawood,* supra.

### THE DUTY OF A DRUG COMPANY AS MEASURED BY LATER KNOWLEDGE

Neither party, in the instant case, disputes the fact that the wording of the 1964 package insert for Ortho-Novum reflected almost verbatim the findings of the Wright Committee.[4]

Appellants argue that it was error to exclude evidence of the standard of care or the proof of causal connection as it existed subsequent to 1964, the date of plaintiff's incident. Furthermore they argue that the trial judge should have considered the testimony of expert witnesses with respect to causal connection, even though their opinions had not been formed until medical literature came out after 1964. This, appellants contend, may properly be one or even the prime criterion on which the expert opinion may be based. We disagree.

In no reported case, has a court imposed liability on a prescription drug manufacturer on the basis of facts or discoveries made subsequent to the date a particular cause of action accrued. To do so would be to fatally choke the industry in its marketing and development procedures. A drug manufacturer would virtually become an insurer against all possible consequences, which at some future date prove to be "caused" by the use of its product. It would cause drug companies to hesitate and prolong the time before precious, beneficial, and long-awaited drugs were put on the market.

Because of the desirability of permitting drugs of proven value to be marketed despite known or suspected risks in said drugs, courts have uniformly held that "a drug, properly tested, labeled with appropriate warnings, approved by the Food and Drug Administration,

---

[4] There is furthermore no contention that Ortho had produced a defectively manufactured drug caused by impurities in the drug. Neither is there a contention that actions by "detail men" misled the prescribing physicians. See, *Incollingo*, supra.

and marketed properly under federal regulation, is, as a matter of law, a reasonably safe product. Accordingly, a person claiming to have suffered adverse effects from using such a drug, unless he can prove an impurity or an inadequacy in labeling, may not recover against the seller. . . ." *Lewis v. Baker,* 243 Ore. 317, 324, 413 P. 2d 400, 404 (1966); see also, *Incollingo v. Ewing,* 444 Pa. 263, 282 A. 2d 206 (1971).

A warning should not be held improper because of subsequent revelations. In an Oregon Supreme Court case, *Cochran v. Brooke,* 243 Ore. 89, 409 P. 2d 904 (1966), the Court held that neither the doctor nor the manufacturer were liable for visual loss suffered by plaintiff who used chloroquine in treatment of ackylosing spondylitis. The Court sustained the action of the trial judge, sitting without a jury, in excluding evidence tending to establish a causal connection between the drug and the loss of vision, where the offered evidence in the form of published reports was not available until after the untoward result suffered by plaintiff. The Court stated at 906: "Thirteen assignments claim the court erred in refusing to admit in evidence numerous brochures, pamphlets and publications which contained reports of doctors who had observed loss of vision by users of chloroquine. Some of the unadmitted documents were published after Dr. Brooke had terminated plaintiff's use of chloroquine and thus were irrelevant to the test of care to be applied in this case. . . . We can find no error in the court's rulings."

By this opinion, I wish to make it clear that a drug manufacturer may not escape liability by merely ignoring existing reports of side-effects or dangers in the use of its product. Neither may a drug company fail to conduct tests and research to obtain such information. Where the particular case is such that there exists proof that the drug company was ignorant of existing facts or derelict in obtaining information readily ascertain-

able to it, a package insert or label will be considered inadequate, and liability accordingly imposed.

It is only because there is an absence of such proof in the instant case that we conclude that the Ortho-Novum package insert adequately represented available medical and pharmacological data. There is every indication that Ortho pursued vigorous independent investigation; that Ortho assisted the Wright Committee in its inquiry; and, that studies conducted by independent laboratories and research groups before and during Mrs. Leibowitz's thrombophlebitic condition in 1964, failed to establish a causal connection between the use of Ortho-Novum and thrombophlebitis.

Under the facts and circumstances of this case, we believe that the trial court acted properly. The complete and voluminous record of the trial and the Adjudication of the trial judge demonstrate that "the verdict is supported by competent evidence and for that reason may not be set aside." *Briskman v. Greenhill Farms of Lower Merion*, 186 Pa. Superior Ct. 482, 485, 142 A. 2d 504 (1958).

We, therefore, affirm the judgment of the lower court.

JACOBS and SPAULDING, JJ., join in this opinion.

---

OPINION BY CERCONE, J., IN SUPPORT OF REVERSAL:

I am of the opinion that the lower court's order refusing plaintiffs' exceptions should be reversed and this case be remanded for a new trial.

The plaintiffs, husband and wife (hereinafter referred to at times merely as "plaintiff"), instituted actions in assumpsit and in trespass against the defendant, Ortho Pharmaceutical Corp., alleging the wife-plaintiff had suffered thrombophlebitis[1] as a result of

---

[1] Thrombophlebitis is a condition in which inflammation of the vein wall has preceded the formation of the thrombus. A thrombus

taking the defendant's drug Ortho-Novum (an oral contraceptive) for menstrual cycle regularity.

The case was heard non-jury, after which the trial judge handed down an adjudication in favor of the defendant on the conclusion that plaintiff had failed to prove a causal connection between her condition and the defendant's drug. Appellants filed exceptions which were dismissed by the court en banc. This appeal followed.

Appellants contend that the trial judge erred in finding that no causal connection had been proved and in limiting plaintiff's proof of causal connection to the state of medical knowledge that existed as of 1964, when plaintiff suffered the condition sued upon.

The trial judge stated: "In both actions, Plaintiffs advance several theories on which recovery could be had, but I find Plaintiffs failed in the first instance, on each theory, to demonstrate any causal connection between Plaintiff-wife's condition and her use of 'Ortho-Novum'.

"In making this determination, I rely upon the medical testimony at trial to the effect that thrombophlebitis is an idiopathic condition, a primary disease, with its own spontaneous origin, and its cause unknown. . . ."

However, the lower court in so stating that "thrombophlebitis is an idiopathic condition" ignored the medical testimony, including that of the defendant, which revealed that thrombophlebitis is not in every case an idiopathic condition, but is a condition which can be rooted in other causes such as post-operative state, cancer, including leukemia, pregnancy, extreme obesity (500 pounds plus), and prolonged dependency edema. In fact, the trial judge, later in his adjudication, admits

---

is a plug or clot in a blood vessel or in one of the cavities of the heart, formed by coagulation of the blood, and remaining at the point of its formation.

such fact when he dismisses plaintiff's medical testimony with the statement that it "failed to give appropriate weight to the fact that *in many cases* thrombophlebitis is idiopathic."

The trial judge concluded that because plaintiff's doctors had attributed her condition to the defendant's drug and had ruled out its idiopathic origin that they therefore failed to consider that in many cases the condition is of spontaneous origin. However, the record reveals that plaintiff's medical testimony did consider the possibilities and probabilities of her thrombophlebitis being wholly idiopathic in origin but nevertheless concluded that it was not of spontaneous origin but was set in motion by defendant's drug.

Dr. Raymond Penneys, to whom plaintiff was sent for care and treatment by her attending physician, Dr. Robert Brooks, was plaintiff's primary medical expert. He restricts his practice to circulatory diseases, teaches in this field, is chief of peripheral vascular diseases at Philadelphia General Hospital, has written many papers on it, and has been in this field for twenty years. Dr. Penneys stated: "I have an opinion that it [Ortho-Novum] is causally related to her thrombophlebitis." He had previously stated the reasoning adopted by him in coming to this conclusion: "What are the factors that may have caused this realizing that factor X, the unknown cause in biology, is present in Ortho-Novum. And, I, therefore, am only preoccupied with the causes that something can be done about, discern about, not the unknown factor, contributing factor. A significant factor would have been taking the oral contraceptive." The trial judge, however, dismissed Dr. Penneys' testimony as having no probative value because "he could not exclude possibilities other than Ortho-Novum as being the cause of the ill-condition." In so concluding, the trial judge was in effect improperly imposing upon plaintiff the duty to exclude all other possibilities.

Whereas, plaintiff was under no duty to exclude all other possibilities but only to present evidence to establish the claimed causal connection with reasonable certainty. In *Cady v. Mitchell*, 208 Pa. Superior Ct. 16 (1966), this court stated at page 22: "Dr. Buck, the first to examine her stated, 'Since I found no other cause for this disc, in my opinion I would say that the accident did cause the disc.' Mr. Miklos, the neurosurgeon who performed an operation to correct the injury said, 'It is my opinion that the trauma that Mrs. Cady sustained in November of '60 was instrumental in producing her symptoms and in producing the pathology for which I performed this cervical laminectomy.'

"We deem this evidence sufficient to establish the connection with reasonable certainty. Menarde v. Philadelphia Transportation Company, 376 Pa. 497, 103 A. 2d 681 (1954); *McCrosson v. Philadelphia Rapid Transit Co.*, 283 Pa. 492, 129 A. 568 (1925); *Fink v. Sheldon Axle & Spring Co.*, 270 Pa. 476, 113 A. 666 (1921)." As to the testimony of plaintiff's witness, Dr. Brooks, the adjudication states: "On direct examination, Doctor Brooks expressed his opinion that there was a 'direct causal relationship between Ortho-Novum' and the thrombophlebitis." But then the trial judge continues: "However, in light of all of Doctor Brooks' testimony 'direct causal connection' can only be taken to mean 'most likely cause'." The trial judge was referring to the fact that Doctor Brooks had testified that he had arrived at his opinion above quoted "after discussing the use of oral contraceptives with some of my colleagues and reading the different pieces that had come out that there *could be* a relationship between the two. Since I could find no other reason at that time *it was my opinion that this was the cause of the thrombophlebitis.*" (Emphasis added.)

As can be seen, however, in *Cady v. Mitchell*, supra, we held similar medical testimony sufficient to estab-

lish causal connection with reasonable certainty. I would, therefore, conclude that neither Doctor Brooks nor Doctor Penneys' explanation of his reasoning process destroyed the definiteness of his opinion that a causal connection existed between plaintiff's thrombophlebitis and Ortho-Novum, and I believe the court below erred in so holding.

Defendant's only medical witness was Doctor Cronk. Doctor Cronk is Vice-President of the defendant company and is its Director of Clinical Research, having held that post since 1962. As to this witness, the court states in its adjudication: "On the other hand, I was impressed with Doctor Cronk, defendant's medical witness, who has extensive experience with the development and research of 'Ortho-Novum'. He stated, after much discussion, that government endorsed medical committees concluded there is nothing to indicate that oral contraceptives might cause a thrombophlebitis in anyone who is predisposed to a thrombophlebitis." However, the Wright Committee Report of 1963 was contrary to the conclusion reached by Dr. Cronk and by the court, for that report did *not* rule out a causal connection between oral contraceptives and thrombophlebitis, but in fact (as Dr. Cronk himself admitted in his testimony) the Wright Committee recommended to the Food and Drug Administration that: "carefully controlled prospective studies be undertaken to obtain more data regarding the incidence of thrombo-embolism and the incidence of death from such conditions in both untreated and treated females among the pertinent age groups." The report states: "With respect to Enovid,[2] *the available data to date does not* establish, *or exclude the possibility,* that the drug produces hyper-coagula-

---

[2] Enovid is a product which, in all respects, according to the evidence adduced at trial, corresponded to defendant's Ortho-Novum.

bility as defined in increases in clotting components or acceleration of clotting kinetics. More complete and extensive studies in the area are clearly indicated. Moreover, the question of the relationship between the hypercoagulable state, as defined above to clinical thromboembolic disease *is still undetermined.*" (Emphasis supplied.) Therefore, at the time plaintiff, in 1964, was taking Ortho-Novum defendant was aware that the drug was being considered as a cause of thrombophlebitis and in fact its "package insert" under the directions of the Federal Food and Drug Administration so indicated, that insert reading: "Contra-indications (1) A few cases of thrombophlebitis have been reported on patients taking Ortho-Novum. Although there is no evidence to support a causal relationship between the use of Ortho-Novum and the occurrence of venous thrombosis, a definite recent history of thrombophlebitis and/or pulmonary embolism is considered a contra-indication to the use of Ortho-Novum." Yet the package insert was headed: "A NEW ORAL CONTRACEPTIVE AGENT OF PROVEN RELIABILITY AND SAFETY", and stated: "No serious side reactions to Ortho-Novum have been encountered. Such side reactions as may occur are mild and transient and tend to disappear on discontinuance of administration."

The above-quoted package insert was prepared in August 1963 and was first used in October 1963. It continued in force until August 1968 when the Federal Government required defendant to change its insert to include the findings of the 1968 British Report that there was a 7 to 10 fold increase in mortality and morbidity due to embolic diseases in women taking oral contraceptives. The 1968 package insert read: "Warnings", "No. 1, The physician should be alert to the earliest manifestations of thrombotic disorders (thrombophlebitis, cerebrovasular disorders, pulmonary embolism, and retenal thrombosis) should any of these occur or be suspected, the drug should be discontinued imme-

diately. Studies conducted in Great Britain and reported in April of 1968 estimate there is a 7 to 10-fold increase in mortality and morbidity due to the embolic diseases in women taking oral contraceptives. In these controlled retrospective studies involving 36 reported deaths and 58 hospitalizations due to 'idiopathic' thromboembolism, statistical evaluation indicated the differences used between users and nonusers were highly significant. The conclusions reached in the studies are summarized in table below. No comparable studies are yet available in the United States. The British data, especially as they indicate the magnitude of the increased risk to the individual patient, cannot be directly applied to women in other countries in which the incidences of spontaneously occurring thromboembolic disease may be different."

There were also letters received before and after 1964 from prescribing physicians to defendant reporting the incidence of thrombophlebitis in patients taking defendant's pill, which letters were required by law to be made part of the Federal Drug Administration's file on Ortho-Novum.

All this information relevant to the issue of causation, whether obtained before or after 1964, should have been accorded full probative value in the determination of that issue. As stated in 17 Am. Jur. Trials §92, at 191-192: ". . . where causation is in dispute, proof that someone was injured in the same way as plaintiff even if only one week before trial would generally be admissible." In this case, the trial judge, whose rulings in the matter were contradictory, inconsistent, and equivocal, failed to accord such evidence probative value and made no reference to the many "physician letters" or to the British Report, choosing instead, as above shown, to adopt a conclusion at variance even with the 1963 Wright Committee Report, which he and Doctor Cronk misinterpreted as ruling out a causal connection.

The trial judge also drew a conclusion as to the pertinence of plaintiff's prior attack of thrombophlebitis 17 years before. He states in his adjudication: "Here, the plaintiff-wife did, in the past suffer the harmful effects of thrombophlebitis. The prior experience made her more susceptible to another experience; more so than another previously unaffected female. The second onslaught comes from causes which are not yet known to medical science. It is a conjecture that such second harmful attack of thrombophlebitis was induced by the use of 'Ortho-Novum'."

I cannot agree with this inference and conclusion. The fact that plaintiff suffered, 17 years before, thrombophlebitis after the birth of a child, did not on the basis of the record before us, have the legal or medical adverse significance on the element of causation which the trial court attributed to it. The complaint against defendant specifically alleged, inter alia, that its drug "did aggravate prior physical conditions, causing conditions that were asymptomatic to flare up and become active and chronic". In support of this, the medical testimony in this case clearly shows that the post-partum period following pregnancy (after the giving of birth)—the circumstances under which plaintiff had suffered her first attack of thrombophlebitis—is recognized as having a causal connection to such condition. Medically speaking, therefore, plaintiff's first onslaught was not of idiopathic origin and thus gives no basis for reasoning that the second attack was idiopathic. Furthermore, the conditions under which the first attack had been suffered could, under the evidence, be considered as duplicated by Ortho-Novum since all the medical testimony in this case agreed that such a drug creates within the patient a change in blood coagulation factors very similar to that occurring in pregnancy and places the patient in a position of "pseudo-pregnancy". Dr. Cronk, testifying for defendant and on

whose testimony the trial judge laid great emphasis, testified: "A. Are you asking does it have an effect on blood coagulation? Q. Yes. A. It causes changes in the blood coagulation factors; 7, 9 and 10, yes. *Very similar to what occurs in pregnancy.* Q. And despite that, doctor, you still reached the conclusion that it was impossible for there to be a relationship; is that it? A. That's correct." It was Doctor Cronk's opinion, however, that there was no corollary between the thrombophlebitis occurring during the post-partum period and that suffered while taking contraceptives because the former thrombophlebitis occurred after the coagulation factor (the heavy level of progestin-estrogen) is back to normal and not while the patient is in the pregnant state duplicated by the taking of contraceptives when the progestin-estrogen level is high. He believed that the post-partum thrombophlebitis was the result of the trauma of giving birth.[3]

If the trial judge wished to adopt this testimony of Doctor Cronk (as he obviously did), he necessarily had to conclude therefrom that plaintiff's first attack was not idiopathic in origin and therefore it could not serve as a basis for finding that plaintiff had a peculiar idiopathic susceptibility to such condition which made its recurrence 17 years later likely.

In my opinion, the evidence does not support the trial judge's inferences and deductions of fact and does not support his ultimate conclusions of fact and law. Unlike the matters of credibility and weight of the evidence, which are within the special province of the fact-finder, it is within the appellate court's power to draw its own inferences and to make its own deductions and

---

[3] Neither party presented testimony as to any possibility that the five-day period of cessation between the 20-day cycles of taking Ortho-Novum resulted in sudden and significant changes in the estrogen-progestin levels, and in blood clotting factors, duplicative of the effect of the trauma suffered in the post-partum period.

conclusions from the facts in evidence: *Kalyvas v. Kalyvas,* 371 Pa. 371, 375-376 (1952). As stated in *Obici Estate,* 373 Pa. 567, 576 (1953) : "... '. . . Furthermore, this case falls within the rule stated in Hindman's App., 85 Pa. 466, 470, that where a finding of fact is simply a deduction from other facts reported by the tribunal under review, and the ultimate fact in question is purely the result of reasoning, we are competent to judge of its correctness and will draw our own conclusions from the facts as reported."

However, we should not, in this case, substitute our inferences and conclusions for those reached by the trial judge as it is our opinion that a new trial is necessitated because of the trial judge's failure during the course of the trial to clearly delineate and rule upon the various theories of liability and to make findings relative thereto,[4] as well as to the issue of causation. On one occasion during the trial, the court entertained the view that the body of knowledge obtained subsequent to 1964 was not relevant to the question of defendant's liability as of 1964, the court saying: "We are not concerned with today." At another point during the course of the trial, the court did recognize the relevancy by rephrasing for plaintiff's counsel the following proper question asked of Doctor Cronk: "Q. Doctor, was there anything to prevent in 1964 the conduct of experiments that would have demonstrated the knowledge that exists presently relating to thrombophlebitis and the use of oral contraceptives?

"MR. MADIERA: Objection. Excuse me, Your Honor. Objection to the question. THE COURT: Well, if you understand it. I think I can indicate what Mr. Rosen is after, and that is, if you know anything in 1968 why ... didn't you know it in 1964?" to which Doctor Cronk gave the following uninforming reply: "THE WITNESS:

---

[4] The trial judge is now deceased.

We had nothing to obstruct our studies in 1964 and as a matter of fact, we have aggressively approached this problem."

Prior to that the court took upon itself to give a reply for Doctor Cronk to a similar question posed by plaintiff's counsel: "Q. Let me ask you this, doctor. Was there anything to indicate that it was impossible in 1964 for you to have the knowledge that existed today as to the connection between thrombophlebitis and the use of your pill? Was there anything to stop you from conducting more scientific studies that you were conducting?

. . .

"THE COURT: . . . I heard the doctor say they are still conducting experiments or having an effort in clinical experiences; is that correct? THE WITNESS: That's correct, Your Honor. MR. ROSEN: Well, did we get the answer? THE COURT: Yes. He said yes, they are still experimenting."

A reading of the trial transcript makes evident that though the trial judge did amend his prior holding and did permit Doctor Cronk to be questioned as to whether or not he could have had in 1964 the knowledge subsequently obtained, such questioning to which the trial judge either replied himself or permitted the witness to answer in unresponsive generalities was not accorded the full probative value to which it was entitled. The law required that defendant be bound to act in accordance with not only the knowledge it did actually possess but the knowledge it could have and should have possessed in 1964: See *Pritchard v. Liggett & Myers Tobacco Company*, 295 F. 2d 292 (3d Cir. 1961) ; *Products Liability—The Ethical Drug Manufacturer's Liability*, 18 Rutgers Law Review (4), 947, 996 (1964). The plaintiff's complaints in trespass and assumpsit expressly alleged that defendant did in 1964 market a drug without adequate testing. The body of knowledge subse-

quently obtained from testing conducted subsequent to 1964 by governmental agencies, other manufacturers, or by the defendant, was relevant to the fact-finder's determination of the important issues: (1) whether under all the surrounding circumstances that body of subsequent knowledge would have been and could have been revealed to the defendant in 1964 had it made proper testing and studies of the drug before marketing it; and (2) if so, whether that body of knowledge so chargeable to the defendant in 1964 was sufficient to support a finding of its liability based either on breach of warranty, negligence in testing or failing to warn or to warn adequately, or strict liability for placing an unreasonably dangerous drug on the market. These theories of liability, all of which were alleged by plaintiff, are separate from one another, each differing in its requirements for recovery, as well summarized in *Product Liability and the Pill,* 19 Cleveland State Law Review (3) 468, 472 (1970) and *Products Liability —The Ethical Drug Manufacturer's Liability,*[5] 18 Rutgers Law Review (4) 947, 982-1008 (1964).

Defendant attempts to argue, though not specifically raising as a governing issue, that liability cannot be imposed upon it in any event because of the intervening conduct of plaintiff's physician in prescribing the drug for plaintiff. Defendant comments that it is sufficient to give the requisite warning to the prescribing physician and that plaintiff's prescribing physician "was fully informed about the product and elected in the exercise of his medical judgment to prescribe it" for the plaintiff. This attempt by defendant to insulate itself

---

[5] Written by Attorney Paul D. Rheingold, now of the New York Bar, who was described in the above-cited Cleveland State Law Review Article as "Trustee of a seventy member Birth Control Pill Group comprised of attorneys with Pill cases who have banded together to render mutual assistance. Most of the group members have one or two cases; a few have a half dozen or more."

from liability on the basis of the treating physician's conduct is negated in the present record by defendant's strongly emphasized and relied-upon principle position, advanced through the testimony of its Doctor Cronk, that the package insert was not intended to constitute a warning to doctors not to give Ortho-Novum to a patient with a history of thrombophlebitis. Doctor Cronk affirmed that it was perfectly all right to give the pill to such a person and that ". . . a patient with predisposing causes is not injured by the taking of Ortho-Novum". Defendant in its brief on appeal states: "There was no justification for considering a prior history of thrombophlebitis as a contraindication." It is defendant's own position, therefore, advanced at trial during the testimony of Dr. Cronk, and advanced in its brief on this appeal, that the package insert did not constitute a warning not to prescribe Ortho-Novum to a patient who had at one time suffered thrombophlebitis and did not intend to indicate any causal connection between its product and such condition. On the contrary, testified Doctor Cronk: "It [the package insert] had to do with the fact that we were trying to get a better statistical base on which to evaluate this problem and one of the things that became important was to see if we could eliminate from the base those patients who had a history of thrombophlebitis for a very simple medical reason [predisposition to recurrence]."

If the package insert was, as defendant so strenuously contends, for statistic-gathering purposes only and did not indicate a causal connection between its pill and thrombophlebitis, and did not intend to constitute a warning to physicians against its use by patients having a history of thrombophlebitis, which use Doctor Cronk regarded as proper and without risk to such a patient, then defendant's attempt to criticize the plaintiff's physician for prescribing its pill most necessarily fail. Furthermore, it would also necessarily follow that

any failure of such prescribing physician to regard the package insert as a warning against prescribing the pill for plaintiff's use would be foreseeable and therefore not an unforeseeable intervening cause which would insulate defendant from liability.

The fact that the pill had been prescribed for plaintiff not for contraceptive purposes but for the regulation of the menses could not, on the record before us, relieve defendant from liability. Doctor Cronk's own testimony disproved any causal connection between the purpose for which the pill had been taken and plaintiff's condition. He unequivocally testifed that to his knowledge there was no more risk of thrombophlebitis from the taking of Ortho-Novum for such a therapeutic purpose as there would be if taken for contraceptive purposes. He explained that the reason Ortho-Novum could not be advertised for therapeutic uses was that the Federal Government had not yet approved such use. He acknowledged, however, that he did have knowledge that the pill was being prescribed by some doctors for therapeutic purposes and that in order to discourage such use it issued, shortly after October 1963 (effective date of first package insert) an instruction to its salesmen "Don't detail Ortho-Novum as a therapeutic." This instruction, which was not communicated to the doctors, obviously was to prevent defendant's violation of the Federal law which had not as yet approved of defendant's dispensing of the pill for therapeutic purposes. As can be seen, the salesmen were not instructed to advise the doctors not to prescribe the pill for therapeutic purposes but were instructed only that they as salesmen should not detail the pill to the doctors as a therapeutic. This was consonant with defendant's reasoning, already stated, that it did not consider the use of the pill for therapeutic purposes created risks other than those attendant to its use for contraceptive purposes.

Since the uncontradicted evidence given by defendant in the transcript now before us is that defendant did have knowledge of the use of its drug for therapeutic purposes and had not instructed against it but regarded use as having no risks, then I must necessarily conclude that such prescribed use by plaintiff's physicians is without factual and legal significance.

I would reverse for a new trial as to the various theories of liability advanced and as to causation.

WRIGHT, P. J. and WATKINS, J., join in this opinion.