628 A.2d 860

**Charles D. HAHN, Appellant,**

v.

**Howard A. RICHTER, M.D. and The
Upjohn Company, Appellees.**

Superior Court of Pennsylvania.

Argued Sept. 9, 1992.

Filed July 16, 1993.

Jeffrey S. Kahn, Norristown, for appellant.

Barton A. Haines, Gladwyne, for appellant.

David W. Brooks, Kansas City, MO, amicus curiae.

Before ROWLEY, President Judge, CAVANAUGH, McEWEN, DEL SOLE, BECK, TAMILIA, KELLY, POPOVICH and FORD ELLIOTT, JJ.

KELLY, Judge:

In this Opinion, we are called upon to determine whether the trial court committed reversible error by refusing to submit to the jury the appellant's, Charles D. Hahn's, requested instruction that a manufacturer of prescription drugs may be held strictly liable under the Restatement of Torts (Second) § 402A for an allegedly deficient warning contained in a prescription drug package insert. The trial court ruled that such an instruction was precluded under Comment K of Restatement of Torts (Second) § 402A. We agree. Thus, we affirm the judgment entered in favor of the appellee, the Upjohn Company.

The relevant facts and procedural history are as follows. On December 29, 1976, the appellant sustained an injury to his back during the course of his employment as a warehouseman at Acme Markets. Performance of this job required the appellant to do a large amount of heavy lifting. As a result of his back injury, the appellant came under the care of Dr. Howard A. Richter. Dr. Richter diagnosed the appellant's injury as a herniated disc and recommended that appellant undergo surgery to repair the disc. The appellant agreed and the surgery was performed by Dr. Richter at Lankenau Hospital on January 27, 1977. On February 22, 1977, the appellant was discharged from the hospital. In March, 1977,

the appellant received Dr. Richter's written permission to return to his job as a warehouseman.

Shortly after returning to work, the appellant suffered a recurrence of extreme pain in his back. The appellant returned to Dr. Richter who advised him to stay home from work and rest. When the appellant's pain did not subside, he was readmitted to Lankenau Hospital from May 18, 1977 to May 28, 1977. During this hospitalization, Dr. Richter noticed that the appellant was developing arachnoiditis, which is a scarring of the arachnoid nerves in the lower back. (N.T. 6/8/89 at 28–29). After the arachnoiditis was discovered, the appellant received his first intrathecal injection [1] of Depo–Medrol, a drug manufactured by the appellee, the Upjohn Company (Upjohn), even though intrathecal injection was not a Federal Drug Administration (F.D.A.) approved usage for the drug.[2] Upon receiving the first intrathecal injection of Depo–Medrol, the appellant's back pain subsided and he received Dr. Richter's permission to return to work on July 18, 1977.

On September 26, 1977, the appellant suffered a relapse of back pain while at work and returned to the hospital until October 15, 1977. During this hospital stay, the appellant had three epidural blocks administered to him. After being released from the hospital, the appellant returned home until extreme pain in his back and left leg forced his re-hospitalization on October 19, 1977. While in the hospital, the appellant consulted with Dr. Richter and Dr. James Meadowcroft, both of whom advised the appellant that a spinal fusion would be necessary. The appellant agreed to have the spinal fusion performed by Dr. Meadowcroft. At this time, the appellant also gave his permission to Dr. Richter to remove the previously discovered scar tissue while Dr. Meadowcroft was performing the spinal fusion. During this operation, Dr. Richter administered the second intrathecal injection of Depo–Medrol to the appellant.

1. An intrathecal injection is administered directly into the spine.

2. Depo–Medrol is approved by the F.D.A. only for intramuscular, intra-articular or soft tissue administration.

Following the appellant's second operation, he continued to experience worsening pain in his left leg. The appellant was readmitted to Lankenau Hospital on January 14, 1978 and a third intrathecal injection of Depo–Medrol was administered by Dr. Richter. The third intrathecal administration of Depo–Medrol alleviated the appellant's symptoms significantly, and Dr. Richter and Dr. Meadowcroft advised him that he could return to work if he were assigned to light duty. However, a light duty assignment was unavailable at the Acme Markets warehouse, so appellant did not return to work at that time.

In May, 1978, the appellant's pain in his back and left leg returned and Dr. Richter administered a fourth intrathecal injection of Depo–Medrol. The cycle of relief through the intrathecal administration of Depo–Medrol and relapse continued throughout the remainder of 1978, 1979, and early 1980, with the appellant receiving four additional intrathecal administrations of Depo–Medrol from Dr. Richter. During this time period, the appellant, with Dr. Richter's permission, sporadically returned to work. The last day the appellant worked was December 30, 1979. Shortly thereafter, on February 4, 1980, the appellant received his eighth and final intrathecal injection of Depo–Medrol; however, the pain in his back and left leg did not diminish at all. The appellant was admitted to the hospital in early March, 1980 and given a myelogram. The result of the myelogram revealed that the appellant had extensive arachnoiditis. Dr. Richter recommended additional surgery to remove the extensive scar tissue which resulted from the arachnodities. The appellant consented. During the course of the surgery, a nerve root was severed, which caused the appellant to suffer a host of serious permanent injuries.

On February 23, 1982, the appellant filed a writ of summons naming Dr. Richter, Dr. Meadowcroft, and Dr. Qualls, together with Upjohn as defendants. A two count complaint was subsequently filed on July 1, 1982. In Count I, the appellant alleged that the defendant physicians were negligent in their treatment of him and failed to exercise the requisite standard of care required of physicians with their respective specialities. Specifically, in Count I, the appellant alleged that the

defendant physicians breached the standard of care by: (1) recommending repeated surgery without adequate indication that the benefits outweighed the risks; (2) recommending that the appellant prematurely return to his warehouseman job before he had properly healed; (3) repeatedly intrathecally injecting him with Depo–Medrol despite known dangers of which the defendant doctors were or should have been aware existed. In Count II, the appellant sued Upjohn alleging that Upjohn was aware, or should have been aware, that the intrathecal injection of Depo–Medrol caused arachnoditis and the formation of scar tissue within the spinal canal, and that despite this knowledge, Upjohn failed to adequately and fully warn physicians of the serious risks attendant to the intrathecal use of Depo–Medrol.

During the next seven years, all parties conducted extensive discovery. On May 24, 1985, the appellant discontinued all of his claims against Dr. Meadowcroft and Dr. Qualls. On the same day, the appellant also executed a joint tortfeasor's release in favor of Dr. Richter in exchange for valuable consideration. However, Dr. Richter remained a party defendant to the litigation as to the questions of liability and the possible apportionment of damages.

At the jury trial, both the appellant and Upjohn presented extensive evidence regarding the drug, Depo–Medrol, and its intrathecal use. The appellant's evidence showed that although intrathecal use of Depo–Medrol was not an approved application of the drug at the time of its market approval by the F.D.A. in 1959, Upjohn was fully aware that it was being used in this manner by some physicians. The appellant also presented evidence that revealed that Upjohn had filed a supplemental New Drug Application (N.D.A.) with the F.D.A. in 1963, seeking to add intrathecal administration as an approved use of Depo–Medrol. In furtherance of its supplemental New Drug Application, Upjohn conducted various clinical investigations regarding the intrathecal use of Depo–Medrol until terminating its supplemental N.D.A. application on April 3, 1969. The appellant maintained that before terminating its campaign for F.D.A. approval of the intrathecal use of Depo–

Medrol, Upjohn received various reports from physicians conducting the clinical investigations as early as 1965, establishing a connection between the intrathecal use of Depo–Medrol and the development of arachnoiditis. The appellant asserted that after receiving these negative reports, Upjohn merely dropped its campaign to get Depo–Medrol approved for intrathecal use without attempting to alert any physicians already using Depo–Medrol intrathecally on their patients that the drug may cause arachnoiditis. The appellant presented evidence which showed that Upjohn did not place a warning on the package insert that arachnoiditis had been reported when Depo–Medrol was used intrathecally until it was directed to do so by the F.D.A. in early 1977. The appellant also presented evidence that Upjohn did not place a warning on the package insert that Depo–Medrol was not recommended for intrathecal use until it was required to do so by the F.D.A. in May of 1980.

In its defense, Upjohn explained that it had ceased trying to get F.D.A. approval for the intrathecal use of Depo–Medrol for economic reasons. Upjohn also presented evidence which showed that the early reports it received concerning a connection between the intrathecal administration of Depo–Medrol and the development of arachnoiditis occurred in clinical investigations involving patients with multiple sclerosis and that arachnoditis is symptomatic of that disease. Upjohn elicited further evidence which established that Dr. Richter had diagnosed that the appellant had arachnoiditis before Depo–Medrol was ever intrathecally administered to him. Dr. Richter also testified that he had not consulted the Physician's Desk Top Reference Book, a reference book which contains all of the package inserts for the various F.D.A. approved prescription drugs, regarding Depo–Medrol since 1973. Dr. Richter further testified that he was not aware at any time during his treatment of the appellant that a connection had been established between the intrathecal administration of Depo–Medrol and arachnoiditis. Additionally, Dr. Richter stated that until he was served with the appellant's complaint in this lawsuit and consulted the Physician's Desk Top Reference Book, he

was unaware that the package inserts contained a warning against using Depo–Medrol intrathecally.

Upjohn also presented expert testimony from the former head of the F.D.A., Dr. Herbert Ley, who testified that Upjohn's warnings contained in the Depo–Medrol package were adequate. Dr. Ley also testified that the F.D.A. would not have allowed Upjohn to contact physicians or send a "Dear Doctor" letter regarding the intrathecal use of Depo–Medrol because it was not an approved use for the drug.

Finally, Upjohn presented evidence regarding several factors which are known causes of arachnoiditis which were present in the appellant's patient history before Depo–Medrol was ever intrathecally administered to him, such as the initial injury suffered by him, the two prior operations and the pantopaque dye used in the first myelogram performed on him in January, 1977.

At the close of the evidence, the appellant requested in his points for charge that the jury be instructed as to both strict liability and negligence regarding the warning placed on the Depo–Medrol package inserts. The trial court refused to give the jury a strict liability instruction, ruling that Comment K of the Restatement of Torts § 402(A) provides an exception precluding a strict liability instruction in cases involving prescription drugs. The trial court grounded its jury instruction solely upon the issue of negligence. The jury returned a verdict in favor of Upjohn. Post-verdict motions were denied. This timely appeal followed.

On appeal, the appellant raises the following issue for our review:

IN A PRODUCT LIABILITY ACTION BROUGHT AGAINST THE MANUFACTURER OF A PRESCRIPTION DRUG, WHERE THE PLAINTIFF'S THEORY OF LIABILITY IS THAT THE PRODUCT WAS DEFECTIVE WHEN SOLD WITHOUT SUPPLYING ADEQUATE WARNING TO THE PRESCRIBING PHYSICIAN ABOUT SERIOUS MEDICAL RISKS KNOWN TO THE DRUG COMPANY, DOES COMMENT K OF THE

RESTATEMENT (SECOND) OF TORTS § 402A, PRO-
VIDE THE DEFENDANT WITH AN EXCEPTION TO
STRICT LIABILITY IN PENNSYLVANIA?

(The Appellant's Brief at 3).

The appellant contends that the trial court erred by failing
to instruct the jury on strict liability in accordance with
section 402(A), Special Liability of Seller of Product for Physi-
cal Harm to User or Consumer, Restatement (Second) of
Torts (1965)).[3] The appellant argues that Comment K to
section 402(A),[4] Unavoidably unsafe products, does not provide

3. § 402A. Special Liability of Seller of Product for Physical Harm to
   User or Consumer
   (1) One who sells any product in a defective condition unreasonably
   dangerous to the user or consumer or to his property is subject to
   liability for physical harm thereby caused to the ultimate user or
   consumer, or to his property, if
      (a) the seller is engaged in the business of selling such a product, and
      (b) it is expected to and does reach the user or consumer without
        substantial change in the condition in which it is sold.
   (2) The rule stated in Subsection (1) applies although
      (a) the seller has exercised all possible care in the preparation and
        sale of his product, and
      (b) the user or consumer has not bought the product from or entered
        into any contractual relation with the seller.

4. Comment K: Unavoidably unsafe products. There are some products
   which, in the present state of human knowledge, are quite incapable of
   being made safe for their intended and ordinary use. These are
   especially common in the field of drugs. An outstanding example is the
   vaccine for the Pasteur treatment of rabies, which not uncommonly
   leads to very serious and damaging consequences when it is injected.
   Since the disease itself invariably leads to a dreadful death, both the
   marketing and the use of the vaccine are fully justified, notwithstanding
   the unavoidable high degree of risk which they involve. Such a
   product, properly prepared, and accompanied by proper directions and
   warning, is not defective, nor is it unreasonably dangerous. [T]he same
   is true of many other drugs, vaccines, and the like, many of which for
   this very reason cannot legally be sold except to physicians, or under
   the prescription of a physician. It is also true in particular of many
   new or experimental drugs as to which, because of lack of time and
   opportunity for sufficient medical experience, there can be no assur-
   ance of safety, or perhaps even of purity of ingredients, but such
   experience as there is justifies the marketing and use of the drug
   notwithstanding a medically recognizable risk. The seller of such
   products, again with the qualification that they are properly prepared
   and marketed, and proper warning is given, where the situation calls
   for it, is not to be held to strict liability for unfortunate consequences
   attending their use, merely because he has undertaken to supply the

Upjohn with an exception to strict liability when the appellant's theory of liability is that the product was defective when sold due to the manufacturer's failure to warn the prescribing physician about medical risks involved with the use of a drug which were known to the manufacturer. The appellant asserts that by refusing to give the jury a strict liability charge, the trial court failed in its obligation to instruct the jury on all theories of liability which would be fairly inferred from the evidence; thus, the appellant asserts that he is entitled to a new trial.

At the outset, we note that in determining whether to reverse a jury verdict due to an erroneous jury charge, an appellate court must look at the jury charge as a whole; if the charge inaccurately describes the law, there is error. *Reilly by Reilly v. Southeastern Pennsylvania Transp. Authority,* 507 Pa. 204, 489 A.2d 1291 (1985); *Summit Fasteners Inc. v. Harleysville Nat. Bank,* 410 Pa.Super. 56, 599 A.2d 203 (1991), *appeal denied,* 530 Pa. 633, 606 A.2d 902 (1991). Alleged errors in the jury instructions must be considered in relation to the entire charge and in light of the evidence presented. *Clayton v. Sabeh,* 406 Pa.Super. 335, 594 A.2d 365 (1991), *appeal denied,* 529 Pa. 639, 600 A.2d 1257 (1991). In order to constitute reversible error, a jury instruction must not only be erroneous, but must also be harmful to the complaining party. *Summit Fasteners Inc. v. Harleysville Nat. Bank, supra* at 62, 599 A.2d at 206; *Jistarri v. Nappi,* 378 Pa.Super. 583, 588, 549 A.2d 210, 213 (1988).

We begin our analysis of the question of the applicability of strict liability under the Restatement of Torts (Second) 402A in cases involving prescription drugs with the cogent remarks of our Supreme Court in the seminal case, *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971).

There is no question that manufacturers of potentially dangerous drugs are held to a high degree of care. As this Court said in *Henderson v. National Drug Company,* 343

public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Pa. 601, 610, 23 A.2d 743, 748 (1942), " * * * the public interest requires the holding of companies which make and sell drugs and medicine for use in the human body to a high degree of responsibility under both the criminal and civil law for any failure to exercise vigilance commensurate with the harm which would be likely to result from relaxing it." The Court went on to say, however, that this consideration did not justify the courts in lowering the standards of proof in cases of this kind. "If we did so, the public interest would be ill served." *Thus, neither the law of Pennsylvania, nor, so far as we are aware, the law of other states has imposed strict liability upon a drug manufacturer merely because of dangerous propensities of the product.*

Section 402A of the Restatement (Second) of Torts imposes strict liability on the seller of any product "in a defective condition unreasonably dangerous to the user or consumer." This section has been adopted as the law of Pennsylvania. *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966). Comment h to the section makes it clear that a product, as to which adequate warning of danger involved in its use is required, sold without such warning is in a "defective condition." Comment j states that "in order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use." The comment continues: "Where warning is given, the seller may reasonably assume that it will be read and heeded; and the product bearing such a warning, which is safe for use if it is followed, is not in defective condition nor is it unreasonably dangerous."

*Incollingo v. Ewing, supra* at 286–88, 282 A.2d at 219–20 (emphasis added).

Our Supreme Court further stated in *Incollingo v. Ewing, supra,* relying on Comment K of Section 402(A), that there are some products which are:

[i]ncapable of being made safe for its intended use, such as new or experimental drugs, as to which, because of lack of time and opportunity for sufficient medical experience there can be no assurance of safety, but such experience as there

is justifies the marketing and use of the drug notwithstanding a medically recognizable risk.

"The seller of such products," concludes this comment, "again with the qualification that they are properly prepared and marketed and *proper warning is given,* where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product attended with a known but apparently reasonable risk."

*Id.* at 287–88, 282 A.2d at 219–20.

In *Incollingo v. Ewing,* our Supreme Court categorized chloromycetin, a prescription drug which had been on the market for more than thirty years at time of its decision as a product which was unavoidably unsafe but justifiably marketed and used notwithstanding a medically recognizable risk. The court further stated that the strict liability rule of Restatement 402(A) is not applicable in a case involving a prescription drug and that the standard of care required for a manufacturer of prescription drugs is set forth in § 388 of the Restatement (Second) which concerns the liability of a supplier of a chattel known to be dangerous for its intended use.[5] *Id.* at 288 n. 9, 282 A.2d at 220 n. 8. *See also Baldino v. Castagna* 505 Pa. 239, 244, 478 A.2d 807, 810 (1984); *Mazur v. Merck & Co. Inc.,* 964 F.2d 1348, 1353–54 (1992).

Our Supreme Court has reiterated its position regarding the unavoidably unsafe nature of prescription drugs and the inap-

---

5. § 388 Chattel Known to be Dangerous for Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

  (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
  (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
  (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous. (Emphasis added).

plicability of the strict liability provisions of Section 402A in *Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 212–13, 584 A.2d 1383, 1386–87 (1991) and *Baldino v. Castagna, supra.* In these two cases, the Supreme Court discussed the applicability of Comment K of Restatement 402A to the Bendectin and Butozoiden–Alka, the two prescription drugs which were involved in those cases.[6]

Due to the inherently dangerous nature of prescription drugs, such drugs are not available to the general public but may be obtained only upon prescription by a licensed physician. *Makripodis v. Merrell–Dow Pharmaceuticals, Inc.*, 361 Pa.Super. 589, 594, 523 A.2d 374, 376 (1987). Thus, the warnings required of a manufacturer of prescription drugs must be directed towards the physician and not the patient-consumer. *Baldino v. Castagna, supra* 505 Pa. at 244–45, 478 A.2d at 812; *Incollingo v. Ewing, supra* 444 Pa. at 286–87, 282 A.2d at 220; *McDaniel v. Merck, Sharp & Dohme*, 367 Pa.Super. 600, 619, 533 A.2d 436, 446 (1987).

This is so because it is the duty of the prescribing physician to be fully aware of (1) the characteristics of the drug he is prescribing, (2) the amount of the drug which can be safely administered, and (3) the different medications the patient is taking. It is also the duty of the prescribing physician to advise the patient of any dangers or side effects associated with the use of the drug as well as how and when to take

**6.** Comment K has been adopted in an overwhelming majority of jurisdictions that have considered the matter. *See, Brown v. Superior Court (Abbot Laboratories)*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988). *DeLuryea v. Winthrop Laboratories, etc.* (8th Cir.1983) 697 F.2d 222, 228–29; *Basko v. Sterling Drug, Inc.* (2nd Cir.1969) 416 F.2d 417, 425–426; *Stone v. Smith, Kline & French Lab.* (Ala.1984) 447 So.2d 1301, 1303–1304; *Gaston v. Hunter* (App.1978) 121 Ariz. 33, 588 P.2d 326, 338–341; *Chambers v. G.D. Searle & Co.* (D.Md.1975) 441 F.Supp. 377, 380–381; *Johnson v. American Cyanamid Co.* (1986) 239 Kan. 279, 718 P.2d 1318, 1323. *But see Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652 (1st Cir.1981) (applying strict liability to prescription drugs); *Feldman v. Lederle Laboratories*, 97 N.J. 429, 479 A.2d 374 (1984) (whether drug is unavoidably unsafe must be determined on a case by case basis). *Collins v. Eli Lilly Co.*, 116 Wis.2d 166, 342 N.W.2d 37 (1984) (Comment K is only applicable if drug in question was placed on the market without adequate testing because of exigent circumstances).

the drug. The warnings which must accompany such drugs are directed to the physician rather than to the patient-consumer as "[i]t is for the prescribing physician to use his independent medical judgment, taking into account the data supplied to him from the manufacturer, other medical literature, and any other source available to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug."

*Makripodis v. Merrell–Dow Pharmaceuticals, Inc., supra* at 596–97, 523 A.2d at 378, citing *Leibowitz v. Ortho Pharmaceutical Corporation*, 224 Pa.Super. 418, 431, 307 A.2d 449, 457 (1973).

■ Accordingly, because of the inherently dangerous nature of all prescription drugs and their limited legal accessibility through a prescription issued by a duly licensed physician, and assuming that there was proper preparation and warning, a manufacturer of prescription drugs is not strictly liable under Section 402A for unfortunate consequences which occur through the use of the otherwise useful and desirable products. *See Baldino v. Castagna, supra* 505 Pa. at 244, 478 A.2d at 810 citing *Incollingo v. Ewing, supra* 444 Pa. at 288, 282 A.2d at 221. Rather, a manufacturer of prescription drugs is liable only if it fails to exercise reasonable care to inform physicians, for whose use the prescription drug is supplied, of the facts which make it likely to be dangerous for its intended use. *See Incollingo v. Ewing, supra* at 288 n. 9, 282 A.2d at 220 n. 8.

Instantly, the appellant has not based his entitlement to a strict liability instruction under Section 402A upon allegations that the Depo–Medrol supplied to Dr. Richter was improperly and defectively prepared by Upjohn in the actual manufacturing process of the drug, thus causing him to develop arachnoditis as a result of its administration. Rather, the appellant asserts that the alleged defect in the drug was that Uphohn was aware and failed to include a warning in the package insert, that the unapproved intrathecal administration of this drug was known to cause arachnoditis. Thus, appellant has based his entitlement to the strict liability instruction upon

Upjohn's failure to adequately warn physicians of the dangers of intrathecal administration of Depo–Medrol rather than a defect in the design or manufacture of the prescription drug.

In *Harford Mutual Ins. Co. v. Moorhead,* 396 Pa.Super. 234, 578 A.2d 492 (1990), we explained the difficulty in distinguishing within the "failure to warn" context between the theories of strict liability (in proving the product defective) and negligence (in proving the seller acted unreasonably) as the two principles appear to overlap.

Although there is contrary language in some decisions, most authorities have been forced to concede that in practice a determination of the adequacy of warnings can be made only by borrowing from negligence concepts. Thus, Dean Keeton has written:

[A] product may be defective as marketed because of a failure to adequately warn, or a failure to use proper means to warn about a risk or hazard related to the way the product was designed.... [L]iability is imposed on the ground that the seller or manufacturer failed adequately to warn about some risk or hazard, or failed adequately to instruct about how to avoid the risk or harm. Under this approach, the product is allegedly defective as marketed because of the failure to properly present it to purchasers and users.

Notwithstanding what some courts have said, in establishing this ground of recovery, the plaintiff in most states must prove negligence in the failure to warn properly. There will be no liability in these cases without a showing that the defendant knew or should have known of the risk or hazard about which he failed to warn. Moreover, there will be no liability unless the seller or manufacturer failed to take the precautions that a reasonable person would take in presenting the product to the public.

Although this ground of recovery is sometimes referred to as strict liability, it is really nothing more than a ground of negligence liability better described as the sale of a product in a defective condition.

*Harford Mutual Ins. Co. v. Moorhead, supra* at 248–49, 578 A.2d at 499–500 citing *Remy v. Michael D's Carpet Outlets,* 391 Pa.Super. 436, 445–446, 571 A.2d 446, 551 (1990) (quoting W. Keeton, The Meaning of Defect in Products Liability Law—A Review of Basis Principles, 45 Mo.L.Rev. 579, 586–87 (1980)). However, the product at issue in *Harford Mutual Ins. Co. v. Moorhead, supra.* was not a prescription drug. Rather it was sulphur strips used for making wine, a product, which unlike prescription drugs, does not fall under the category of "unavoidably unsafe products" set forth in Comment K to section 402A of the Restatement of Torts. *Mazur v. Merck & Co. Inc., supra* at 1355 n. 8. Therefore, we were not compelled in *Harford, supra,* to invoke the section 388 "reasonableness" standard applied by our Supreme Court in *Baldino v. Castagna, supra* and *Incollingo v. Ewing, supra,* in cases involving the warning labels on prescription drugs.

Therefore, as was aptly set forth by the California Supreme Court in *Brown v. Superior Court (Abbott Laboratories),* 44 Cal.3d 1049, 1059 n. 4, 245 Cal.Rptr. 412, 417 n. 4, 751 P.2d 470, 476 n. 4 (1988).

> The test stated in comment k is to be distinguished from strict liability for failure to warn. Although both concepts identify failure to warn as the basis of liability, comment k imposes liability only if the manufacturer knew or should have known of the defect at the time the product was sold or distributed. Under strict liability, the reason why the warning was not issued is irrelevant, and the manufacturer is liable even if it neither knew nor could have known of the defect about which the warning was required. Thus, comment k, by focussing on the blameworthiness of the manufacturer, sets forth a test which sounds in negligence, while imposition of liability for failure to warn without regard to the reason for such failure is consistent with strict liability since it asks only whether the product that caused injury contained a defect.

Accordingly, we hold that the trial court correctly refused to give the jury a strict liability failure to warn instruction under Section 402A as such an instruction has been

precluded by our Supreme Court's application of Comment K to all prescription drugs. Thus, the trial court properly instructed the jury to examine Upjohn's conduct regarding the dangers of the intrathecal administration of Depo–Medrol in light of the "reasonableness" standard set forth in Section 388.

Based upon the foregoing, the judgment entered in favor of Upjohn is affirmed.

Judgment affirmed.

ROWLEY, President Judge, joined both Majority Opinion and CAVANAUGH'S, J., Concurring Opinion.

CAVANAUGH, J., filed a Concurring Opinion and joined Majority Opinion.

McEWEN, J., joined DEL SOLE'S, J., Dissenting Opinion.

DEL SOLE, J., filed a Dissenting Opinion.

BECK, J., joined both Majority Opinion and CAVANAUGH'S, J., Concurring Opinion.

TAMILIA, J., joined Majority Opinion.

POPOVICH, J., joined Majority Opinion.

FORD ELLIOTT, J., joined DEL SOLE'S, J., Dissenting Opinion.

CAVANAUGH, Judge, concurring:

I JOIN the majority decision, and would supplement it with the following two comments.

## I.

Both the appellant and the appellees find support for their positions in Comment k of the Restatement (Second) of Torts, as do the Majority and the Dissenting Opinions. This is particularly true of the Dissenting Opinion, which quotes extensively from Comment k to support its analysis and suggests that the Majority Opinion misreads it.

Pennsylvania has "adopted" section 402A of the Restatement (Second) of Torts, of which Comment k is a part. However, by this we do not mean that we should attempt to divine the meaning of each adopted section as if it were ordained doctrine. "Even where this Court has "adopted" a section of the Restatement as the law of Pennsylvania, the language is not to be considered controlling in the manner of a statute." *Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 212, 584 A.2d 1383, 1385 (1991). Moreover, we often adopt a Restatement section on our own terms, and reflect its spirit rather than the literal language. *Lorah v. Luppold Roofing Co.*, 424 Pa.Super. 439, 447 n. 3, 622 A.2d 1383, 1387 n. 3 (1993).[1]

While it may seem counter-intuitive that two or more substantively different readings of Comment k can be made, Comment k is ambiguous and can legitimately be read to support both the Majority Opinion and the Dissenting Opinion. *See Brown v. Superior Court (Abbott Laboratories)*, 44 Cal.3d 1049, 1069 n. 11, 245 Cal.Rptr. 412, 424 n. 11, 751 P.2d 470, 482 n. 11 (1988) (language of Comment k unclear). Thus, while I do feel it advances our inquiry to a limited extent, it does not provide us with with an answer to what Comment k should mean to the practitioners in this jurisdiction. I would rely on the the explication of case law in the Majority Opinion, which accurately denotes the tenor of Pennsylvania law in regards to allegedly defective prescription drugs vis-a-vis Comment k.

## II.

The Majority Opinion, as indicated *supra,* correctly declares the tenor of Pennsylvania law in this area. I wish to add an

---

1. A major problem that I find with certain Restatement sections is a lack of clarity. This problem is well-illustrated by Comment k, which allows the reader to supply his or her own interpretation due to the vaguery of its language. This in turn may be part-and-parcel to the Restatement's attempt on the one hand to summarize the law in our several states and at the same time to predict the direction it will take. *Lorah, supra; see also Grundberg v. Upjohn Co.*, 813 P.2d 89, 95 (Utah 1991) (recognizing that Restatement both summarizes and predicts the direction of the law); Keyes, *The Restatement (Second): Its Misleading Quality and a Proposal for Its Amelioration*, 13 Pepperdine Law Review 23 (1985).

additional rationale why section 402(A) of the Restatement should not be applied to cases involving allegedly defective prescription drugs.

In *Azzarello v. Black Bros. Co., Inc.,* 480 Pa. 547, 391 A.2d 1020 (1978), the Pennsylvania Supreme Court recognized, en route to fashioning a jury instruction in products liability cases, that the judiciary plays an important role in determining the efficacy of a product in a strict liability case. In *Azzarello,* the Supreme Court addressed the appropriateness of instructing the jury that it had to determine in a products liability case whether that product was "unreasonably dangerous." *Id.* at 551, 391 A.2d at 1023. The Court felt that the term "unreasonably dangerous" was not appropriate for a jury instruction. *Id.* at 556, 391 A.2d at 1025. The Court distinguished between the role of the judiciary and the role of the jury in a products liability case. *Id.* at 558, 391 A.2d at 1026. While a jury is competent in resolving a dispute as to the condition of a product, it does not have the institutional capacity to decide whether the product's condition justifies placing liability on the supplier in the first place. *Id.* As the Court stated:

> Should an ill-conceived design which exposes the user to the risk of harm entitle one injured by the product to recover? Should adequate warnings of the dangerous propensities of an article insulate one who suffers injuries from those propensities? When does the utility of a product outweigh the unavoidable danger it may pose? These are questions of law and their resolution depends on social policy. Restated, the phrases "defective condition" and "unreasonably dangerous" as used in the Restatement formulation are terms of art invoked when strict liability is appropriate. It is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint.

The Court went on to state, in light of the court's role in determining the policy considerations of a product's efficacy,

that the sole inquiry for the jury was whether the product left the supplier's control lacking any element to make it safe for its intended use. *Id.* at 559, 391 A.2d at 1027.

In light of *Azzarello*, I believe that it is not only appropriate, but mandated by our Supreme Court that the judiciary, as opposed to juries, consider the policy implications of applying section 402A of the Restatement to a particular product. *See, e.g., Fitzpatrick v. Madonna*, 424 Pa.Super. 473, 623 A.2d 322 (1993). However, the tenor of the Dissenting Opinion is that the jury is the proper entity responsible for determining whether a product is "unavoidably unsafe." The Dissenting Opinion states near the end of its analysis as follows:

> However, even if evidence was offered at trial to show that the prescription drug at issue was "unavoidably unsafe" as described in Comment k, such a determination should be for a jury to make and use when assessing the adequacy of the warnings provided. If a jury determined that a drug is experimental or that it is known to be unsafe but of great utility, the jury would then have to determine if such facts accompanied the product. Absence the inclusion of these warnings, strict liability would apply.

Dissenting Opinion at 874. The Dissenting Opinion makes no reference to the *Azzarello* requirement that a court, before applying sections 402A of the Restatement, consider whether the plaintiff's averments of fact justify recovery in light of public policy. Thus, it appears that the Dissenting Opinion would abdicate to a jury the responsibility for weighing the social benefits and costs of a particular product. I believe that not only would this be an explicit rejection of *Azzarello's* pronouncements, but as a matter of public policy, particularly in reference to prescription drugs, it is unsound.

Two important, interrelated, public policy considerations exist for treating a prescription drug different than other manufactured products. First, prescription drugs are (potentially) inherently dangerous products whose costs are considered by society to be more beneficial than its potential harm. Second, the Food and Drug Administration ("FDA") has the institutional capacity and legislative mandate for weighing the

costs and benefits for particular pharmaceuticals. These considerations underlie our special treatment of prescription drugs, *see, e.g., Leibowitz v. Ortho Pharmaceutical Corp.,* 224 Pa.Super. 418, 307 A.2d 449 (1973), and militate strongly that we find that negligence rather than strict liability as the appropriate standard for determining whether the manufacturer has adequately warned of a prescription drug's risk.

The first important policy consideration in this area is that prescription drugs are inherently dangerous products which are considered, *ex ante,* beneficial to society as a whole. Unlike most manufactured products, prescription drugs are considered dangerous. When not properly dispensed, prescription drugs can cause sickness or even death. Consequently, society has heavily regulated their use, such that they can be taken only when prescribed and monitored by a physician. Despite their inherently dangerous nature, we tolerate their use because the gain for society as a whole outweighs the risk that they may harm particular individuals. Unlike most other manufactured products, prescription drugs play a significant a role in dissipating suffering and in prolonging human life. While the downside of using prescription drugs is that, even under a physician's care, an individual can have an adverse reaction, their use is considered beneficial to society as a whole.

The second policy consideration in this area is that the FDA has a particular institutional capacity to determine whether a pharmaceutical's health benefits outweigh its risks. Congress has created a regulatory agency, the FDA, to "protect consumers from dangerous products." *United States v. Sullivan,* 332 U.S. 689, 696, 68 S.Ct. 331, 335, 92 L.Ed. 297 (1948). In approving a new drug application, the FDA balances the "expected therapeutic gains" against the "risks entailed by its use." *United States v. Rutherford,* 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). Before a new drug is approved, federal law requires (1) preliminary evaluation of a pharmaceutical's chemical and therapeutic properties; (2) testing in animal models; (3) detailed protocols for testing in humans; (4) double-blind, placebo-controlled testing on sever-

al hundred persons; and (5) at least two long-term clinical trials including large groups of patients to assess safety, effectiveness and optimal dosage. *See* 47 Fed.Reg. 46,622, *et seq.* (Oct. 19, 1982); 48 Fed.Reg. 26,720, *et seq.* (June 9, 1983); 21 U.S.C. §§ 301, *et seq.* (1988).

This agency not only has the responsibility, but the resources, to fulfill its mission of balancing the risks against the benefits of particular pharmaceuticals. The application is reviewed by many types of health professionals who work within the FDA's National Center for Drugs and Biologies, including physicians, pharmacologists, chemists, and microbiologists. 47 Fed.Reg. 46626 (Oct. 19, 1982). The recommendation of the health professionals is in turn reviewed by management personnel within the National Center for Drugs and Biologics before a final decision is made on the drug's application. *Id.* After the application is approved, the FDA has a process for monitoring adverse reactions to an approved pharmaceutical, as federal regulations mandate that all adverse reactions to a pharmaceutical be reported to the agency. 21 C.F.R. § 314.80(b). A drug manufacturer typically spends millions of dollars in developing or testing new drugs. *See Drug Price Competition and Patent Term Restoration Act: Hearing Before the Senate Comm. on Labor and Human Resources,* 98th Cong.2d Sess. 106 (1984).

Based on the above, I would accordingly find that public policy is best served by not applying the doctrine of strict liability to prescription drugs. Prescription drugs are inherently dangerous products which benefit society. Moreover, a federal agency exists which is devoted to weighing the known benefits and costs of marketing a particular drug. A rule of law which held a pharmaceutical company bound for unforeseeable reactions to their products, notwithstanding the FDA's significant oversight of a drug's approval, would stifle the incentive to produce new products. The FDA is in a unique position to make the decision whether a drug is efficacious, and to preserve the incentive for a company to produce a beneficial pharmaceutical. Juries and the judiciary do not have the requisite knowledge, resources, or societal mandate

to make the decision as to a prescription drug's relative worth. Accordingly, the relevant inquiry is and should be the reasonableness of a pharmaceutical company's conduct, as a pharmaceutical manufacturer should not be the insurer against all possible consequences in light of the policy considerations *supra*.

As indicated by *Azzarello*, whether a product is "unreasonably dangerous" is a question of social policy that is within the province of the judiciary. In the peculiar instance of prescription drugs, social policy is best served by not holding bound a drug manufacturer for a prescription drug's unforeseen consequences absent negligence. Our holding today does not totally insulate from liability a drug manufacturer. Far from it. Rather, it only absolves a drug manufacturer of being held strictly liable for a defective product. We have found that the doctrine of negligence provides to the consumer a high degree of protection in a prescription drug products liability case. *Incollingo v. Ewing*, 444 Pa. 263, 287, 282 A.2d 206, 219 (1971); *White v. Weiner*, 386 Pa.Super. 111, 562 A.2d 378, 384 (1989), *aff'd.* 525 Pa. 572, 583 A.2d 789 (1991). Our ruling today serves the needs of society by balancing the need to provide incentive for new prescription drug production with protecting the consuming public.

ROWLEY, President Judge, joined both Majority Opinion and CAVANAUGH'S, J., Concurring Opinion.

CAVANAUGH, J., filed a Concurring Opinion and joined Majority Opinion.

BECK, J., joined both Majority Opinion and CAVANAUGH's, J., Concurring Opinion.

DEL SOLE, Judge, dissenting.

Today the Majority has taken a giant step backward by reintroducing negligence principles in a product liability case. By holding that proof of negligence is necessary to recover from a prescription drug manufacturer, this court has, in essence, abolished strict liability as a theory of recovery

available to those injured as the result of the consumption of an unreasonably dangerous product sold by a drug manufacturer in a defective condition. In arriving at this result, the Majority ignores almost thirty years of products liability jurisprudence in this Commonwealth, gives no reason for such a policy change, and fails to analyze how its decision would effect persons who have been injured by prescription drugs such as Thalidomide and DES. The Majority reaches its unprecedented decision by misapplying Comment k of the Restatement of Torts (Second) Section 402A to the facts of this case, and by misreading the comment itself and those cases which have in the past made reference to it.[1]

Section 402A generally directs that "special" strict liability will be imposed on sellers of a product in instances where a consumer is harmed by the product which is sold "in a defective condition unreasonably dangerous" to the consumer. Comment j which follows Section 402, notes that some products which might otherwise be considered "unreasonably dan-

1. In his concurring Opinion, Judge Cavanaugh advances two policy considerations for his view that prescription drug manufacturers should not be burdened by compensating persons injured as a result of their defective products.

First, he suggests that while prescription drugs are inherently dangerous their beneficial effect to society as a whole outweighs the fact that they may harm particular individuals. Stated another way, he concludes that a person injured by a defective drug should not be compensated for the injury, but can take solace in the fact that, in general, drugs help society. I disagree. People injured by a defective product should be entitled to seek recovery from its manufacture whether it be drugs, food, autos, or any item placed in the stream of commerce. Since the seller is able to spread the loss over the entire product line, it is paid for by the society that benefits from the product. The drug industry is sufficiently protected since we have required that warnings of a drugs effects need only be provided to physicians and not the general public.

Second, Judge Cavanaugh suggests that FDA approval is sufficient to safeguard the public. I agree that the FDA goes a long way to eliminate risks associated with prescription drugs. However, there are at least two reasons for not exempting products subject to FDA pre-approval from § 402A liability. First, Congress did not preempt the tort law of the states when creating the FDA. Second, much of the data relied on by the FDA is generated by the manufacturers. It is not independently produced. A continuing risk of liability will serve to enhance the proper development and description of drugs offered for commercial sale.

gerous" can be prevented from being so, if proper directions or warnings are issued. In such a case, the properly labeled product will not be "defective," nor unreasonably dangerous, and thus, the seller cannot be held strictly liable.

Comment k, which the Majority views as speaking to all prescription drug cases, is actually directed to all cases in which the product itself will always be unavoidably unsafe because it simply cannot be made safe for ordinary use. The comment advises that such products "are especially common in the field of drugs," but nowhere does it read that all prescription drugs can be characterized as unavoidably unsafe.

Comment k describes two types of products which it views as incapable of being made safe with the scientific knowledge presently held. The first example presented is the vaccine for the Pasteur treatment of rabies. The Comment notes that the use of the product involves a very high degree of risk, but its use is justified since the disease itself leads to death. The Comment states that "[s]uch a product properly prepared, and *accompanied by proper directions and warning* is not defective, nor is it *unreasonably dangerous.*" Thus, where a consumer is advised of the danger of taking a drug such as the rabies vaccine which is known to be dangerous but has great utility since it is used to avoid certain death, the seller will not be held strictly liable for harm caused by the disclosed unavoidable risk because the risk was disclosed and the product can no longer be considered "defective" or "unreasonably dangerous". Conversely, where an unavoidably unsafe product is not accompanied by a warning of its danger, the user will be uninformed, and the product will be considered defective and unreasonably dangerous exposing the seller to a strict liability claim.

Experimental drugs are given as the second example of an unavoidably unsafe product. Comment k recognized that with these drugs there is justification for their distribution, despite the fact that very often there can be no assurances of safety. The comment notes that strict liability should not apply to the seller of such products "with the qualification that they are

properly prepared and marketed, and proper warning is given."

In a situation where a new drug to combat the AIDS virus is created, this example would apply. Although such a drug may not be thoroughly tested at the time of distribution, and adverse side effects of its use may not yet be discovered, the need for it is great because of the deadly nature of the disease which it fights. Comment k instructs that the seller will not be strictly liable if a patient is harmed by the drug, provided it was properly prepared and the user has been warned of the drug's experimental nature and the lack of knowledge of future side effects. A seller's failure to abide by these duties owed to a user makes the drug defective even if experimental. Thus, its use is unreasonably dangerous and the seller would be strictly liable in the event of injury.

The protections offered by Comment k provide a haven for developers of new drugs which have great potential benefit, and protection to those marketing existing drugs that have a risk that cannot be eliminated. By advising the user of an experimental drug of its known risks, or that the risks are yet unknown, the seller has done all that can be expected and will not be held strictly liable for harm caused by the use of the product. Also, while there are commercial products that will remain "unavoidably unsafe," they will not be deemed to be "defective" if the user of the product is properly warned. However, where a seller fails to disclose unavoidably known risks or the experimental nature of the product, Section 402A applies and the seller will remain strictly liable for harm caused by that risk. Just as the seller in Comment j will not be held strictly liable if proper warnings accompany a product, the seller of an unavoidably unsafe product will avoid strict liability if proper warnings of the product's condition are given to the consumer. The absence of these warnings make the product "defective" and "unreasonably dangerous" and will cause the manufacture to be held strictly liable.

The Majority wrongly concludes that a manufacturer of a prescription drug cannot be strictly liable under 402A, and in support of its ruling relies upon language found in past cases.

156

It begins with reference to our Supreme Court's decision in *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971). The Majority interprets footnote nine in *Incollingo v. Ewing, supra.* as the basis for its statement "that the strict liability rule of Restatement 402(A) is not applicable in a case involving a prescription drug and that the standard of care required for a manufacturer of prescription drugs is set forth in § 388 of the Restatement (Second) which concerns the liability of a supplier of a chattel known to be dangerous for its intended use." Majority Opinion at 865. The Majority, however, neglects to add that strict liability was not pled in *Incollingo*, rather the Supreme Court stated repeatedly throughout the opinion that that complaint against the drug manufacturer claimed that it "negligently and carelessly manufacture[d] the said drug" *Id.* at 285, 282 A.2d at 218, and that the manufacturer of the drug "negligently failed to warn ... of the dangerous effects of the drug, failed to perform proper tests on the drug, and failed to take necessary precautions to avert the injuries complained of." *Id.* at 269, 282 A.2d at 211. The *Incollingo* court's notation in footnote nine advising that the strict liability rule of § 402A was not applicable to its decision, was necessary because the case was pled as a negligence case and recovery based upon strict liability was not sought.[2]

In *Baldino v. Castagna*, 505 Pa. 239, 478 A.2d 807 (1984), a like claim was made. In fact, the court stated that the "theory of liability against [the drug manufacturer] was primarily based on th[e] ... decision in *Incollingo v. Ewing*." *Id.* 505 Pa. at 244, 478 A.2d at 810, *citing Incollingo, supra.* In both of these cases, the Supreme Court employed a negligence standard because the parties claimed a negligence failure to warn when adequate printed warnings provided by the manufacturer were nullified by the promotional claims made by the manufacturer's salespersons. The cases apply a negligence standard because the plaintiffs' complaints sought damages for

2. The repeated reference by the Supreme Court to negligence being the basis of the claim in *Incollingo*, is readily explained by observing that the lawsuit was filed in 1961, five years before the adoption of Section 402A in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). At the time suit was filed, negligence was the only available basis for recovery.

negligent acts and not because a negligence standard overlaps, with or is equivalent to, a strict liability standard in a failure to warn case.

As further support for its position that Section 402A does not apply to prescription drug cases, the Majority cites *Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 584 A.2d 1383 (1991). Nowhere in that opinion does the Supreme Court adopt the position suggested by the Majority. Actually, the case supports the application of strict seller liability for defective prescription drugs. It holds that the extent and adequacy of warnings sufficient to avoid Section 402A liability are measured by what information a prescribing physician needs. It further held that the purposes of 402A liability would not be served by extending sellers liability, under the circumstances there presented, to pharmacists. However, the Court did not eliminate 402A liability for manufactures of prescription drugs.

The cases relied on by the Majority do not differ with Comment k's instruction that strict liability will not apply to an unavoidable unsafe product, assuming that there is proper preparation and warning. But it is the absence of proper warnings, not the failure to exercise reasonable care in providing such warnings, which causes the product to be defective and unreasonably dangerous, and therefore causes its seller to be strictly liable for harm caused by its use. Comment k teaches us that even those products which are unavoidably unsafe can be sold without subjecting its seller to strict liability if the product is accompanied by adequate warnings of its danger or its experimental nature. What is to be considered is whether the product was supplied with adequate warnings; negligence theories have no place in such an analysis. *See Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1984).

In the instant case Appellant alleged and attempted to prove at trial, that the drug, Depo–Medrol, was defective when sold because it lacked adequate warning to the prescribing physician. It was never determined whether Depo–Medrol was a new or experimental drug, and the record does not

disclose that proof of such was ever even offered. Because, in my view Comment k does not come into play in this case where the product is not shown to be "unavoidably unsafe" a requested instruction should have been given by the court. The jury should be advised:

A product otherwise properly made is defective if the supplier does not adequately warn of the dangers of the product. If you find that when the product left the supplier's control, it lacked the warnings necessary to make it safe for its intended use, then the product was defective, and the supplier is liable for all harm caused by the defect.

*Dambacher by Dambacher v. Mallis, supra.* at 63, 485 A.2d at 429–30.

However, even if evidence was offered at trial to show that the prescription drug at issue was "unavoidably unsafe" as described in Comment k, such a determination should be for a jury to make and use when assessing the adequacy of the warnings provided. If a jury determined that a drug is experimental or that it is known to be unsafe but of great utility, the jury would then have to determine if such facts accompanied the product. Absence the inclusion of these warnings, strict liability would apply.

In either instance, application of negligence principles have no place in a Section 402A strict liability case.

For these reasons I dissent and would grant a new trial in which the jury would be charged on the principles of strict liability for failure to warn of the dangers of the prescription drug, Depo–Medrol.

McEWEN, J., joined DEL SOLE'S, J., dissenting opinion.

FORD ELLIOTT, J., joined DEL SOLE'S, J., dissenting opinion.